# Richmond.

## ANDREWS v. COMMONWEALTH.

### March 12, 1902.

1. TRIAL—*Continuance—Absent Witness—Immaterial Evidence.*—The evidence in this cause failing to show the materiality of an absent witness, it was not error to refuse a continuance on account of such absence.

2. EVIDENCE—*Spontaneous Declarations—Res Gestæ.*—The outcries of a wounded man at the time he was shot, giving the name of his assailant, are admissible in evidence as parts of the *res gestæ.*

3. CRIMINAL LAW—*New Trial—Verdict Contrary to Evidence—Rule of Decision—Case at Bar.*—An application to this court to set aside a verdict in a criminal case on the ground that the verdict is contrary to the evidence is heard as on a demurrer to the evidence, and hence will be refused where the evidence is conflicting. In the case at bar, the prisoner relied upon the defence of an *alibi,* and the chief ground of contention was the identification of the prisoner as the assailant. The shooting took place about midnight on a starlight night, and the prosecutor and his wife each testified that they identified the prisoner; the prosecutor saying that he was within five yards of him, had lived with him for nine years, and recognized him by his voice. There was other evidence tending to sustain the prosecutor and his wife, and also evidence tending to discredit them. Threats by the prisoner against the prosecutor were also proved. It was held that it was the province of the jury to weigh the evidence, and their verdict cannot be disturbed.

Error to a judgment of the County Court of Amelia county, rendered October 8, 1901, sentencing the prisoner to the penitentiary for a term of nine years. The Circuit Court refused a writ of error.

*Affirmed.*

The opinion states the case.

*Wm. H. Mann*, for the plaintiff in error.

*Attorney-General Wm. A. Anderson*, for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

At the October term, 1901, of the County Court of Amelia county, Vaughan O. Andrews was tried and convicted for feloniously shooting W. J. Maitland, and sentenced to the penitentiary for nine years.

When the case was called for trial, the prisoner moved for a continuance, which motion was overruled and exception taken. He also moved to set aside the verdict as contrary to the law and the evidence, and to the action of the court in overruling that motion the prisoner excepted, and the evidence was certified.

To the judgment complained of a writ of error was allowed by one of the judges of this court.

The ground of the motion for a continuance was the absence of the wife of the prisoner. Her materiality was not shown, but to the contrary, it appeared from her own affidavit that the facts to which she would have deposed were not relevant to any issue in the case; and her testimony, if objected to, would not have been admissible. The affidavit explained why Mrs. Andrews was living separate and apart from her husband, and denied that it was on account of his supposed improper intimacy with other women.

The Commonwealth introduced no testimony touching the matters set out in the affidavit, and the prisoner could not, therefore, have been prejudiced by the action of the trial court in overruling his motion for a continuance.

It appears that the prisoner, at the date of the commission of the crime of which he was convicted, was sixty years old, and

resided on his farm in Dinwiddie county, not far from the Amelia county line. His children had grown up and moved away, and his wife was living with a married daughter in the city of Newport News. For nine years W. J. Maitland and his wife had lived with the prisoner, the former as a hand, or cropper, on the farm, and the latter in the capacity of housekeeper and cook. These relations continued until May, 1901, when a difficulty occurred between the prisoner and Maitland about the latter's children, and he and his wife quit the service of the prisoner and moved into a house in the vicinity. The house was soon afterwards destroyed by fire; and, at the suggestion of the prisoner, the Maitlands returned to his home. There they remained until some time in June, when the prisoner and Maitland had a second quarrel over stripping tobacco, and the latter again left with his family and moved to Amelia county, into a house owned by R. M. Gittman, his brother-in-law. On June 9, Mrs. Maitland walked to the prisoner's residence to look after some chickens which she had left there. When about to depart for her home in the afternoon, the prisoner remarked that she was in no condition to take so long a walk, being in an advanced stage of pregnancy, and invited her to spend the night, promising to carry her home in his buggy next day. The invitation was accepted, and when they arrived at her home on the following day, Maitland was very angry, and cursed and abused his wife for spending the night from home. Prisoner remonstrated with him for thus abusing Mrs. Maitland, and undertook to explain why she did not return the previous day, whereupon Maitland turned on him and gave him, as he declared to several witnesses, the worst cursing he had ever had in his life. Prisoner, from that time until July 11, made repeated trips to the house of Tom Dunnavant, a negro who lived in the neighborhood of the Maitlands, where he would meet Mrs. Maitland, and urge her to try to persuade her husband to return to his home and live with him, offering, as an inducement,

to pay him $8 a month, to feed him and his family, and to give him four barrels of flour at Christmas. Prisoner assigned as a reason for not going to Maitland's house, that he did not care to go upon Gittman's premises when he was endeavoring to induce his tenant to leave—not a very satisfactory explanation for his conduct in meeting Mrs. Maitland at a negro's cabin, and carrying on negotiations with her rather than with her husband. His last visit to Dunnavant's was on July 11, the afternoon of the day on which the shooting occurred. Mrs. Maitland, it seems, failed to meet him on that occasion, for the reason that she had company. He thereupon sent the Maitlands a message to the effect that if they wanted to see him, they must come to his house, as he would not come back any more, and drove off.

Mrs. Maitland testified that in one of these conversations the prisoner remarked that unless her husband would return and live with him, "no matter where he went, he was his meat"—which threat she communicated to Henry Martin and Ben Winn prior to the shooting.

Ned Lewis testified that the prisoner told him some time before the shooting that Maitland had given him the worst cursing he ever had in his life, and said, in that connection, "Damn him, he may go; I will get him."

Hamner and Wills also testified that prisoner told them of how Maitland had cursed him.

Maitland's account of the shooting was that about midnight on Thursday, July 11, 1901, the prisoner came to his house and called, "Hello," and when he went to the door, enquired the way to Bob Gittman's; that he came out in the yard and exchanged one or two words with prisoner, "and caught on to him," and told his wife it was Mr. Andrews; that prisoner was standing within fifteen feet of him, and shot him with a breech-loader charged with buckshot. One shot penetrated his right side, and his right hand was shot off. He had lived with prisoner

for nine years, and knew him by his voice, and was within five yards of him when he shot, and saw him. He had no doubt about its being the prisoner, and when the shot was fired he cried out that Vaughan Andrews had shot him.

Mrs. Maitland testified that she followed her husband to the door, and recognized the prisoner, and knew his voice.

Robert Gittman lived four hundred and thirty yards from Maitland. He was awakened by his wife, who told him there was something the matter with her brother. Witness went out on his porch, and Maitland called to him and said that Andrews had come there and shot him. Continuing, he said: "I ran to him, regardless of brush, briers, and everything, went straight to him; and when I got there, just before putting my hands on his yard fence, he said, Brother Bob, Andrews has come and shot me; and his wife says, What shall I do? Vaughan Andrews has come and shot Button (Maitland). What must I do?"

It was proved that the night was very bright, one witness testifying that it was as bright a night as he ever saw without a moon. It is undisputed that prisoner was ruptured, and, in consequence, did not ride horseback, but was accustomed to travel in a buggy.

Ben Thomas testified that about 12 o'clock on the night of the shooting he was on the main road about a mile and three-quarters from Maitland's house; that he heard a vehicle coming from that direction, and a man drove by in a top buggy; that he "took it to be Mr. Andrews' horse and buggy, and took it to be Mr. Andrews." He estimated the distance from prisoner's home to Maitland's at eight miles; and that was the opinion of J. W. Mallory, a merchant at Wilson's Depot, as to the distance. Prisoner gave the distance as thirteen miles.

The foregoing is a summary of the evidence on behalf of the Commonwealth.

There was an unsuccessful attempt made to impeach the general character of the Maitlands for truth and veracity, and to

show material discrepancies between their testimony at the trial and statements made on a different occasion.

It was attempted also to establish by experiments on the ground, in September following the shooting, that it was impossible for Maitland and his wife to have recognized the prisoner.

The value of such tests must depend upon the identicalness of conditions, involving the power of vision of the experimenter, his familiarity with the appearance *and voice* of the person sought to be identified, the physical characteristics of such person, the brightness or obscurity of the night, and the like.

But however that may be, the jury, after hearing the details of the tests made, accepted the positive testimony of Maitland and his wife, that they did recognize the prisoner both from his personal appearance and by his voice. Their testimony was strongly corroborated by the evidence of Gittman as to the outcries of the wounded man at the time he was shot.

Those cries were spontaneous, were parts of the *res gestœ*, and made under circumstances which repel the suggestion that they were fabrications. On the subject of spontaneous declarations, see monographic note to the case of *Jordan* v. *Com.*, Virginia Reports Annotated, 25 Gratt. 628—IV.

It was further insisted that no motive was proved for this attempt at assassination. It may be readily conceded that there was no justifiable motive for so heinous a crime. But the motives of criminals cannot be measured by the same standards as those that regulate the conduct and actions of upright men.

The prisoner was living alone. For nine years the Maitlands had been inmates of his home, and, for some reason best known to himself, he was most solicitous for them to return and live with him again. When thwarted in that purpose, he made repeated threats of vengeance. How well he carried them into execution, the wounded side and maimed arm of his unhappy victim is a silent but convincing witness.

There is nothing in the record which tends to show that this humble man had an enemy on earth, or that any one other than the prisoner could have been interested in his assassination.

The effort of the prisoner to prove an *alibi* rests upon his own testimony and that of his tenants, R. M. and Irby Hudson; and the veracity of the latter was assailed by some of his former neighbors from the county of Charlotte.

That theory is in direct conflict with the testimony of witnesses for the Commonwealth, and cannot prevail.

In this case, by statutory provision, the rule of decision in this court must be governed by the principles applicable to a demurrer to evidence. Acts 1889-'90, p. 36. Those principles are so familiar that to repeat them is unnecessary. With the limitations which they impose, the verdict of the jury cannot be disturbed, and the judgment of the County Court must be affirmed.

*Affirmed.*