# CRIMINAL CASES

## 𝕾taunton

### PATTERSON v. COMMONWEALTH.

September 13, 1912.

1. EVIDENCE—*Dying Declarations—Belief in Imminence of Death—Case at Bar.*—In order to make a dying declaration admissible, it must be made to appear plainly that the declarant had given up all hope of life, and believed that death was impending. Belief in the possibility, or even the probability, of death is not sufficient; it must be in its certainty; and while all the attending circumstances, including the nature of the wound, are to be considered in determining whether or not there was a belief in the imminence of death, it is not sufficient to show that death did actually occur a few hours after the declarations were made. In the case at bar, the declarations offered do not measure up to these requirements.

2. EVIDENCE — *Dying Declaration — Self-serving Declarations.* — Dying declarations are only admissible in evidence as to the circumstances of the transaction itself which results in the death of the declarant. Declarations of the declarant as to his attitude towards the accused and his daughters prior to the date of the homicide are self-serving and not admissible in evidence.

3. HOMICIDE—*Evidence—Aggression of Deceased.*—On a trial for homicide where there is evidence tending to show that the deceased was the aggressor, evidence of the state of feeling between the deceased and the accused prior to the homicide is admissible as tending to throw light upon the situation and occurrences.

Error to a judgment of the Circuit Court of Rockbridge county.

*Reversed.*

The opinion states the case.

*Glasgow & White* and *G. D. Letcher,* for the plaintiff in error.

*Samuel W. Williams, Attorney-General,* for the Commonwealth. '

CARDWELL, J., delivered the opinion of the court.

At the September term of the Circuit Court of Rockbridge county, 1911, plaintiff in error was indicted for the murder of S. H. Campbell on June 30, 1911, and at that term of the court he was put upon trial, but the jury failed to agree upon a verdict. The case was again tried at the November term of the court, 1911, when the jury found a verdict of guilty of murder in the second degree and fixed the accused's punishment at six years in the penitentiary, which verdict the court refused to set aside.

The assignments of error in the petition, upon which this writ of error was awarded the prisoner, relate (1) to the admission of improper evidence; (2) exclusion of evidence offered by the defense; (3) instructions given on behalf of the Commonwealth, and the rejection of instructions asked for by the defense; (4) refusal to set aside the verdict and award a new trial because of after-discovered evidence; and (5) refusal to set aside the verdict because contrary to the law and the evidence.

The deceased, it appears, moved to the house where he died about Christmas preceding the occurrence resulting in the wound inflicted by plaintiff in error upon him, which was followed by his death, and, according to evidence in the record unobjected to, from the time he went there he began to behave very badly towards plaintiff in error and his two daughters who lived near him, growing out of the refusal of plaintiff in error to allow hunting on his lands. Plaintiff in error lived upon his own land with his two daughters, aged sixteen and seventeen years, respectively, whose mother died when they were about twelve years younger, since which time he had the entire care

of these girls, carrying them about with him until they became large enough for one to remain at home while the other went with him to work when he went to the fields. Deceased, on numerous occasions and whenever opportunity was afforded, not only used abusive language to plaintiff in error in the presence of his daughters, but behaved in the presence of the latter, when alone and unprotected, in the most indecent and shocking manner, using language too vile and indecent to be here repeated. There was evidence tending to show that on the morning of the day of the homicide plaintiff in error left his home accompanied by one of his daughters, each riding a horse, to go to his mountain land, one mile up South river, where he and his daughter had seen a groundhog the day before, and for the purpose of killing it carried his double-barrel gun loaded with large shot; that when they reached the turn of the road at which the deceased's house, situated several hundred yards off, could be seen, they observed him standing in the door, where he remained until they got opposite his house, when he came down to the railroad and disappeared behind a sycamore and other trees in foliage at the time, after which plaintiff in error and his daughter neither thought nor saw anything more of the deceased until about one hundred yards further on, when they turned back at an acute angle into plaintiff in error's right of way leading across the railroad up to his mountain land, at which time they saw the deceased, looking mad, step off the railroad down towards them, muttering something which could not be understood because of the roar of the river, and thereupon plaintiff in error told the deceased to go away and not give him any trouble; that deceased then cursed plaintiff in error and told him "he had to take it, that he had it in for him," and threw a rock which came close to plaintiff in error's head, and came on quickly throwing another rock which also nearly

struck him, which rocks deceased took from his pockets or from under his overall flap; and then came to the gate which was about thirteen steps from the railroad and picked up another large rock and started to rise, with his left hand extended towards the latch of the gate, saying, "Damn you, I will come through and kill you this morning"; whereupon plaintiff in error lowered his gun and shot one barrel of it through the gate at deceased's legs, the shot taking effect in his right leg between the knee and the body. Plaintiff in error fired but one barrel of his gun, and the deceased, after standing a moment, dropped the rock from his hand and walked back towards his home, and when about seventy-five yards, or about half the distance to his house, laid down by the railroad track, from which point he was later carried to his home, where he died about seven o'clock that evening.

The court is of opinion that the dying declarations of the deceased, allowed to go to the jury at the trial over the objection of plaintiff in error, were improperly admitted in evidence (1) because it was not clearly shown that the deceased believed he was going to die when these declarations were made; and (2) even if the deceased had believed he was going to die at the time he made the declarations narrated by the witness Painter, some of the statements said to have been made by the deceased were not a part of the *res gestae,* nor did they relate to the transaction itself which resulted in the declarant's death.

The Commonwealth introduced one B. D. Armstrong as a witness, who testified, over objection by plaintiff in error, that he was a brakeman on the train of the N. & W. Ry. Co. which came along about 7:25 o'clock A. M. on the morning that deceased was shot, and saw him by the railroad, his wife and children and one Gerald being with him, and he asked witness to help him up, and upon witness doing so (presumably) deceased said, "Lay me down and let me

die." This was nothing more than a simple exclamation
on the part of the deceased, actuated doubtless by the sen-
sation of pain and suffering at the time in his wounded
leg, but in no wise proves that he thought he was going
to die, and threw no light whatever, as we shall presently
see, on his frame of mind five or six hours after when the
so-called dying declarations under consideration were
made.

The witness Painter, a brother-in-law of deceased, alone
testifies as to the dying declarations of the deceased ad-
mitted in evidence, and as far as pertinent his statement
is: "After I got my dinner I went back to Campbell's
and staid there until about two o'clock, when I went to
Vesuvius, and when I got back later in the evening Camp-
bell was dying. When I got back to Campbell's (about
two o'clock), after dressing Patterson, I told him what
Patterson said about him throwing the rocks, and Camp-
bell said that there had been no trouble between him and
Patterson, and he asked me whether Patterson said that
he had thrown any rocks. Says he, 'Did he say that?' and
Campbell then said that he had been telling him (Painter)
all day that he was going to die and that he never had any
trouble with Patterson only at the spring on the moun-
tain, and that Patterson said that he had eight feet of
his land and must put the fence back, and that Patterson
ripped out an oath and refused to speak to him. Camp-
bell said there had been no trouble between them, and that
Patterson shot and killed him for nothing; that Patterson
said, 'God damn you, don't come through my gate or I
will blow your brains out!' And Campbell said that he
hoped he would die that minute if he threw a rock, that
whether Patterson's nerve failed him or not he did not
know, but that he dropped the gun from his head and
shot him in the leg. When I went back after the arrest
he was resting; not suffering much, but said, 'I am poorly';

that he never had mistreated Patterson's daughters—respected them as his own." On cross-examination the witness said that when Campbell made the above statement to him he took a glass of water without assistance, and in drinking it choked; that he then assisted him to take some medicine that the doctor had left there, and with witness' help Campbell took the medicine and did not choke, and took it easily and without trouble; that when witness asked him about taking the medicine Campbell said that "he did not reckon it would do him any good," but that he would take it, and he did take it; that Campbell made no arrangements about dying, either about his worldly affairs or about his soul; that he asked nobody to have prayers or read the Bible, and did not ask for the preacher; that he heard Campbell talking about not wanting to go to Buena Vista hospital, but wanted to go to Roanoke, but he did not say for what reason; that Campbell told nobody goodbye, and that witness shortly after hearing the above conversation went up to Vesuvius, and when he got back later in the evening had no further conversation with Campbell, and Campbell said nothing to anyone, and died about seven o'clock.

The attending physician, upon reaching the deceased, found him suffering from great loss of blood, and he (deceased) said that if something was not done to relieve his pain he would die. This physician further testified that "the bleeding had stopped when I reached Campbell. I relieved his pain. He said he was easier." It further appears from the testimony of this witness that when he left deceased shortly before his alleged conversation with the witness Painter, not only was the hope of life held out, but without any suggestion of death he suggested to deceased that he would take him to the Buena Vista hospital, but the deceased said that he wanted to go to the hospital at Roanoke. The physician never told deceased or anyone

else that he (deceased) was going to die, but did say to
some that his chances were poor, or not good. True, he
says also that when he reached the deceased he knew that
if something was not done to relieve his pain he would die,
but he says also, as we have just stated, that when he
reached deceased the bleeding had stopped, and he relieved
his pain and talked with him about going to the hospital
and he stated that he wanted to go to Roanoke and not
to Buena Vista.

Another significant fact, appearing in the record, going
to show the absence of thought on the part of the deceased
or those around him that he was under a sense of im-
pending death, and without any expectation or hope of re-
covery, is that his wife, knowing little or nothing about
the matter, went to the preliminary hearing given the
plaintiff in error by a justice several miles from their home
on the day deceased was shot, and was gone several hours.

It is very true that in ascertaining consciousness of ap-
proaching death recourse should naturally be had to all
the attending circumstances, such as the nature of the in-
jury, etc., but in this case neither the nature of the injury
nor the circumstances shown clearly warranted the con-
clusion that the deceased was conscious of approaching
death when he made the statements introduced as his dying
declarations.

It will not do to say that because death did actually oc-
cur a few hours after the declarations were made, the con-
clusion must be reached that the declarant was conscious
of approaching death when they were made.

In *Jackson's Case*, 19 Gratt. (60 Va.) 667, the deceased
appeared impressed with the belief that he would soon die,
and generally so expressed himself; and in the preparation
for death made his will; yet after waking up from a nap
of sleep he said, "Who knows but that I may get well"; and
this was held to imply the existence in his mind of a pos-

sibility of his recovery, and evidence offered as to dying declarations made by him were not admissible.   See also *Bull's Case,* 14 Gratt. (55 Va.) 620; *Swisher's Case,* 26 Gratt. (67 Va.) 964, 21 Am. Dec. 330; *O'Boyle's Case,* 100 Va. 785, 40 S. .E. 121; *Bowles' Case,* 103 Va. 815, 48 S. E. 527.

In the case of *Tip* v. *State,* 14 Lea (Tenn.) 502, the facts and circumstances relied on as a sufficient foundation for the introduction in evidence of certain alleged dying declarations of the deceased were strikingly similar to the facts and circumstances relied on in this case, but the court, in an opinion reviewing the authorities at home length, held that there was not sufficient proof that the deceased was without any hope of recovery, and therefore the evidence as to his dying declaration had to be rejected.   The opinion quotes from Lord Coleridge in *Rex* v. *Spillbury,* 7 C. & P. L. 87, as follows: "It is an extremely painful matter for me to decide upon; but when I consider that this species of proof is an anomaly and contrary to all the rules of evidence, and that if received it would have the greatest weight with the jury, I think I ought not to receive the evidence unless I feel fully convinced that the deceased was in such state as to render the evidence clearly admissible.   It appears from the evidence that the deceased said he thought he should not recover, as he was very ill.   Now, people often make use of expressions of that kind who have no conviction that their death is near approaching. If the deceased in this case had felt that his end was drawing very near, and that he had no hope of recovering, I should expect him to be saying something of his affairs, and of who was to have his property, or giving some directions as to his funeral, or as to where he would be buried, or that he would have used expressions to his widow purporting that they were soon to be separated by death, or that he would have taken leave of his friends

and relations in a way that showed he was convinced that his death was at hand. As nothing of this sort appears, I think there was no sufficient proof that he was without any hope of recovery, and that I therefore ought to reject the evidence."

"It follows from the general principle that the belief must be not merely of the possibility of death, nor even of its probability, but of its *certainty*. A less stringent rule might with safety have been adopted, but this is the accepted one. The tests have been variously phrased: there must be 'no hope of recovery'; 'a settled expectation of death'; 'an undoubting belief.' Their general effect is the same. The essential idea is that the belief should be a positive and absolute one, not limited by doubts or reserve; so that no room is left for the operation of worldly motives." 2 Wigmore on Ev., sec. 1440.

Among the authorities cited in support of the text is the case of *Peak* v. *State*, 50 N. J. L. 222, 12 Atl. 701, in which the opinion by Beasley, C. J., says: "(The declarant) shall have a complete conviction that death is at hand. * * * Death shortly to ensue must be an absolute certainty, so far as the consciousness of the person making the declaration is concerned." The syllabus of that case, so far as pertinent, is "In order to make dying declarations admissible, the State must make it plainly apparent that the declarant had given up all hope of life, and believed that death was impending." "Where the surgeon told the patient she might die at any moment, and that there was but one chance, from a contemplated operation, and the patient said she did not expect to recover, but would like to, and the conditions of the situation did not control such expressions; *held*, that the statements of the patient then made were not admissible, on the ground that it was not shown that such declarant had given up all hope of life."

See also 4 Va. & W. Va. Enc. Digest, p. 848, where under the head' *"Foundation for the admission of the evidence,"* it is said that the rule (as stated in the authorities above cited) is a well settled rule, and all the decisions of this court relating to the subject are cited.

Dying declarations are only admissible in evidence as to the circumstances of the transaction itself which results in the death of the declarant. Clark's Crim. Proc. 525; 9 Am. & Eng. Enc. L. 679; *O'Boyle's Case, supra.* The absence of any self-serving purpose to be furthered on the part of the declarant is an essential element of the circumstantial guarantee of the trustworthiness of dying declarations. 2 Wigmore on Ev., sec. 1443.

The so-called dying declarations of the deceased admitted in evidence in this case are obnoxious to the established rules governing the admissibility of such evidence, not only because they were not confined to the transaction itself which resulted in the death of the deceased, but contained self-serving declarations as to his attitude toward plaintiff in error and his daughters prior to the date of the transaction, notably that he (deceased) "had never mistreated Patterson's daughters—respected them as his own."

At the trial of the case, after the said declarations had been admitted in evidence and after one of the daughters of plaintiff in error had been allowed to testify as to deceased's conduct toward her, her father and her sister, and had given an account of his solicitations and attempted assault upon her "in the mountain field," which fact she straightway communicated to her father, counsel for the defense offered to prove by one Aud. Davis that the deceased, prior to the occurrence, had in vile language declared his purpose to do just what the daughter of the deceased testified he had attempted to do, but the witness, Davis, was not allowed to testify; to which ruling plaintiff in error excepted, and assigns error.

As before stated, the declarations of the deceased as to his conduct towards the daughters of the accused were not admissible and ought to have been excluded; but the trial court having admitted them, the accused ought to have been permitted to contradict the said declarations of the accused. In the view we take of the case neither the said declarations of the deceased nor the statements which the deceased made to Davis were admissible, and upon the next trial neither should go to the jury.

We shall not attempt to consider at length the assignment of error relating to the instructions given for the Commonwealth and the refusal of instructions asked for the defense—in ·fact, it is not necessary.

The instructions to the jury given for the Commonwealth were embraced in one very lengthy and detailed statement of the principles of law applicable to cases of homicide in general, and to the evidence in this case in particular, and then contains the following paragraph: "And you are further instructed that even though you may believe from the evidence that the deceased, Sam'l Campbell, had used insulting and threatening language to the accused, and had used improper and indecent language to and about the daughters of the accused, in their presence and in his presence, yet unless you further believe from the evidence and all the immediate circumstances surrounding the killing of deceased, that he was the aggressor and that said accused acted in self-defense, with the real or apparent necessity of saving himself from death or great bodily injury, you cannot consider such evidence at all in arriving at your verdict."

The contention of counsel for plaintiff in error is that not only were the instructions given for the Commonwealth confusing to the jury and misleading, but that the language of the instructions just quoted was not a correct statement of the law, as applied to the facts which the

52

evidence in the case tended to prove, and was in conflict with an instruction given for the defense, in which the court rightly instructed the jury that in considering the quesion as to whether Campbell made an attack upon Patterson which led to the shooting, they might consider the evidence of the state of feeling between Campbell and Patterson preceding same as throwing light upon the situation and occurrences.

We are of opinion that the principle of law propounded in the insruction for the defense, which told the jury that they might consider the evidence of the state of feeling between Campbell and Patterson preceding the shooting as throwing light upon the situation and occurrences, was a correct one, and therefore the language embraced in the instructions given for the Commonwealth, quoted above, was in conflict therewith and should not have been given.

As the other questions raised with respect to the instructions are not likely to arise upon another trial of the case, they need not be considered here; and for the same reason it is not necessary to consider the assignment of error relating to the refusal of the court to grant the accused a new trial because of after-discovered evidence.

The remaining assignment of error is to the refusal of the court to set aside the verdict of the jury because contrary to the law and the evidence, and as the case has to be remanded for a new trial we deem it inexpedient to review the evidence certified in the record.

It follows that the judgment of the circuit court has to be reversed, the verdict of the jury set aside, and the case remanded for a new trial to be had not in conflict with the views expressed in this opinion.

KEITH, P. (concurring in results) :

I think the dying declaration which appears in the record was too broad, and that so much of it as related to facts not directly connected with the homicide should have been excluded, but that subject to proper correction the declaration should have been admitted.

Whether or not a dying declaration is admissible depends largely upon the mental condition of the declarant. If a man who has received a wound believes that wound to be mortal and that he will shortly die of it, his declaration is admissible, and I know of no way in which his mental attitude can be ascertained except by what the declarant may say and do.

In the case under consideration Campbell stated that he was going to die; and when offered the medicine said that he "did not reckon it would do any good, but that he would take it." There was no word which emanated from him between the time he received the wound and the moment of his death which cast the slightest doubt upon his sincerity or upon his belief that he was within the shadow of impending death. It is true that when the physician spoke to him about sending him to a hospital, he said that he preferred to go to the hospital at Roanoke rather than that at Buena Vista; but there was nothing that indicated that he entertained the slightest hope of recovery, and as a matter of fact he died on the afternoon of the day he received the wound.

I think the dying declaration was admissible, but should have been confined to the facts connected with the homicide, and for these reasons I concur in the judgment of reversal, but not in the opinion of the court.

*Reversed.*