# Staunton

## JOHN COMPTON v. COMMONWEALTH.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory
and Browning, JJ.

The opinion states the case.

*B. T. Wilson* and *Clarence C. Burns,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

This case is here upon a writ of error to a judgment of the Circuit Court of Russell county, sentencing the defendant, John Compton, to a term of five years in the penitentiary, upoh a conviction of voluntary manslaughter.

The undisputed facts are: On the morning of the 15th day of August, 1932, the deceased, Melvin Strouth, a cousin and brother-in-law of the defendant, went to the home of Charles Compton (a brother of defendant), and, observing one of his horses hitched near by, inquired of Mrs. Grace Compton the reason for his horse being there. Mrs. Compton informed Strouth that his son Joe had brought the horse, and had requested her to deliver the horse to his grandfather. Strouth then inquired as to the whereabouts of Joe and was informed that Joe, at the request of defendant, had gone off with a threshing machine. Upon receiving this information, Strouth became greatly angered and began to curse, and stated that he was going to get his son Joe if he had to kill him, and that he would "get" the defendant, if he had to go into the latter's house to get him. Mounting his horse, Strouth rode through a field to the public road in the direction of the home of defendant. The State road force was engaged in work upon the highway and was operating a scarifier drawn by a tractor. The operation had drawn a number

of people to the scene. The defendant, who resided near by, was on his way to the place of operation when he was met by Strouth, who asked defendant why he sent Joe off with the threshing machine. Defendant replied that he had not done so. Thereupon, Strouth dismounted from his horse, called the defendant a damned liar and struck him with his fist. After being struck several times, defendant picked up a rock, and Strouth, who was armed with a pistol, reached into the bib of his overalls and told him if he did not throw the rock down he would shoot his "G— d— guts out." Defendant dropped the rock and was again struck by Strouth. Finally, the defendant requested Strouth to go with him to the home of Charles Compton and said he could prove by Grace Compton that he did not send Joe with the threshing machine. Defendant in front, with Strouth immediately behind him, making gestures, proceeded to the Charles Compton home. When the two men arrived at the Compton home a number of women were on the porch. A short distance therefrom, several men who had witnessed the altercation upon the highway, were observing the actions of the two men. Instead of verifying the statement of defendant, Grace Compton informed Strouth that defendant did send Joe with the threshing machine.

There is a conflict of evidence regarding the happenings from that point until the shot was fired by defendant. Witnesses for the Commonwealth stated that just prior to the shooting, Strouth was standing immediately in front of the doorway; that he had been scratching his head with his right hand, but had lowered his hand to his side, whereupon the defendant shot him.

According to the testimony for the defense, when defendant arrived at the home he went into a room of the house and picked up a pistol lying on a bed; Strouth had threatened to kill defendant if Grace Compton did not corroborate his statement; when informed by Grace Compton that defendant had sent Joe with the machine, Strouth made four or five "surges" for his pistol, and then

the defendant fired one shot which struck Strouth in the body. There is no dispute that immediately after the shot was fired Strouth was seen with a pistol in his hand and delivered the same to one Arthur Davis, a witness for the Commonwealth, in the trial.

The record further discloses that Strouth was placed in an automobile by Davis and another person and conveyed to the hospital at Richlands, a distance of several miles. During the progress of the journey, Strouth stated several times that "he thought he was killed." After making the statement, "I believe I am killed," he then asked Davis if he thought the wound was serious. Davis replied that he could not tell. Strouth then said: "I want to tell you how this thing happened." He said when Compton went in the house and came back with the pistol he stated, "Damn you, I have got you where I want you now, and I am going to kill you." Over the objection of the defendant, the statement was admitted as a dying declaration.

Upon Strouth's arrival at the hospital, he informed Dr. Williams that he had been shot by Compton and he did not *think* he would get well. The doctor informed him that he could not tell, that he would have to be operated upon. Strouth was operated on in the afternoon and died during the night.

Again over the objection of the defendant, Dr. Williams was permitted to testify that Strouth stated to him that just before the fellow shot him he told him he would shoot his heart out.

Peyton Strouth, a brother of the deceased, was permitted to testify: "He told me after he said he was bound to die, he said, 'He tolled me up to Mr. Charles Compton's and shot me.'"

The admission of the foregoing statements as dying declarations is assigned as error.

The crux of the defendant's contention is that no proper foundation was laid for the introduction of the alleged dying declarations. In that contention we concur.

In his Exposition of the Law of Crime and Pun-

ishment, at page 288, Professor John B. Minor thus clearly and concisely states the Virginia rule: "Dying declarations are admissible only in case of *homicide,* when made by the person injured touching the cause of his death, while actually *in extremis,* and *conscious that he is so,* under a sense of *impending death,* and without any expectation or hope of recovery."

Prior to the introduction of the evidence complained of, no proof was offered that Strouth was in reality *in extremis* or *articulo mortis.* There was no evidence tending to show his general appearance, his strength or lack of strength, his pulse, his heart action or any other physical symptom except pain; nor was it shown that any vital organ of the body had been penetrated, or what the exact nature of the wound was. True it is that Dr. Williams stated that an operation was necessary, as Strouth was bleeding very profusely. It is also true that the doctor stated to Strouth that he would get him "fixed up," and offered him encouragement as to the result of the operation. Not once did he indicate to Strouth that he was *in extremis.* Though perfectly rational for several hours after he was shot, according to the testimony of all the witnesses, it is a significant fact that at no time did Strouth speak of his affairs, express any regret that he could not live, or leave any message to his relatives.

In *Patterson's Case,* 114 Va. 807, 75 S. E. 737, 738, which, in our opinion, controls the case at bar, the foundation for the admission of a dying declaration was laid by the introduction of a witness who stated that the deceased said: "Lay me down and let me die." In holding that the subsequent alleged dying declaration was inadmissible, Judge Cardwell said: "This was nothing more than a simple exclamation on the part of the deceased, actuated doubtless by the sensation of pain and suffering at the time in his wounded leg, but in no wise proves that he thought he was going to die, and threw no light whatever, as we shall presently see, on his frame of mind five or six hours after

when the so-called dying declarations under consideration were made."

In a dissenting opinion Judge Keith expressed the view that the dying declaration was admissible, and said:

"Whether or not a dying declaration is admissible depends largely upon the mental condition of the declarant. If a man who has received a wound believes that wound to be mortal and that he will shortly die of it, his declaration is admissible, and I know of no way in which his mental attitude can be ascertained except by what the declarant may say and do."

Following the *Patterson Case* is *Pendleton* v. *Commonwealth,* 131 Va. 676, 109 S. E. 201. There the *Patterson Case* is dealt with at length and the doctrine laid down by Judge Cardwell, that the dying declaration must be made under a sense of *impending death,* is approved.

Mere belief in the possibility, or even the probability, of death is not sufficient; there must be a certainty of it eventually.

In Wharton on Homicide (3d Ed.), p. 1006, we read: "Subsequent inquiries by an injured person as to whether the person addressed thought he would live show a sufficient hope of recovery to defeat his dying declaration as evidence, though he had declared his expectation of impending death."

In *Jackson's Case,* 19 Gratt. (60 Va.) 666, the court said:

"These dying declarations are an anomaly in the reception of evidence, and are only admissible where all hope, not only of ultimate recovery, but of a prolonged continuance of life, has left the mind of the person making them. In *Rex* v. *Hayward,* 6 Car. & Payne R. 157, Chief Justice Tindal thus expresses the rule: 'Any hope of recovery, *however slight,* existing in the mind of the deceased at the time the declaration is made, would undoubtedly render the evidence of such declarations inadmissible.' See, also, 1 Wharton's Am. Crim. Law, section 671. In *Bull's Case,* 14 Gratt. [55 Va.] 620, it is thus laid down: 'The rule of law is now well settled, that to render dying declarations

admissible evidence, they must be shown to have been made when the declarant is under a sense of impending death, and without any expectation or hope of recovery.' "

When the rule above stated is applied to the evidence admitted, it is manifest that the evidence, in the absence of a proper foundation for its admission, was prejudicial.

What has been said applied to the objection urged against the admission of the evidence of George Call, a witness for the Commonwealth.

The remaining assignment of error is to the refusal of the court to set aside the verdict because contrary to the law and the evidence, and as the case has to be remanded for a new trial, we deem it unnecessary to consider that assignment.

The judgment of the circuit court will be reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed.*