# Richmond

ROSE BATTEN v. COMMONWEALTH OF VIRGINIA.

November 21, 1949.

Record No. 3584.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Hale Collins* and *R. C. Stokes*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Henry T. Wickham, Assistant Attorney General*, for the Commonwealth.

MILLER, J., delivered the opinion of the court.

On Sunday, November 9, 1947, about 8 o'clock in the evening, Marion Piercy Anderson entered the Chesapeake and Ohio Railroad Hospital, Clifton Forge, Virginia, asked for medical aid and collapsed. When a physician arrived, he

was unconscious. Upon examination he was found to be suffering from two .32 calibre bullet wounds, one of which proved fatal. He died at 1:45 a. m., Saturday, November 15, 1947.

An autopsy disclosed that had he been operated upon his life could not have been saved. The fatal bullet had pierced the abdominal cavity, severing and destroying beyond repair the blood vessels that furnish the necessary supply of blood to the small bowel. That, in turn, caused a sloughing away of the bowel and peritonitis inflammation of the lining of the abdomen. Death at some early date was inevitable.

Immediately after Anderson's entry into the hospital, Rose Batten was found seated in his automobile in front of that building. She was crying and hysterical, but attempted to give an account of how the wounds had been inflicted, which, if true, would have absolved her of unlawful homicide. She was, however, indicted for murder, convicted by a jury of voluntary manslaughter and sentenced to five years imprisonment.

The material assignments of error pertain to the admissibility of evidence.

The Commonwealth contends that three statements made by Anderson at different times were properly admitted as dying declarations. Accused asserts that none of them measure up to dying declarations and that prejudicial error was committed when they were received.

To establish the circumstances immediately surrounding the shooting and to prove that the wounds were wilfully inflicted, the Commonwealth offered the testimony of Ann Gabbert and Wanda Anderson, sisters of deceased. Their evidence in this respect constitutes a recital of three alleged dying declarations made in the hospital. One was made to Ann Gabbert at 10:00 p. m., Sunday, November 9th, about two hours after infliction of the wounds. The second on Monday, November 10th, to Wanda Anderson and testified to by her. The last statement was made in the presence of

both sisters on Thursday, November 13th, about thirty-six hours before Anderson's death.

The statements were objected to by accused on the grounds that Anderson was not *in extremis* when the first two were made, nor was it sufficiently proved that he was conscious of impending death without hope or expectation of recovery at any time. In short, accused maintains that no proper foundation was established for the introduction of all or any of the statements.

The setting, circumstances and contents of Sunday's declaration follow: While the nurse was out of the patient's room this conversation passed between brother and sister:

"Well, that night he started vomiting and I got up to hold the pan for him and I was wiping his forehead, and when I finished wiping his forehead and he was through vomiting, he said, 'Ann, I'm dying', said, 'I don't think I'll live until morning'. He said, 'I want you all to take care of mom for me'. And I said, 'Where did it happen'. And he said, 'At the Shell service station. I was out for a pack of cigarettes and when I came back and started to get in the car she shot me'. And that was all he told me at that particular time."

Monday's statement is best disclosed by a question propounded to Wanda Anderson and her answer thereto.

"Q. What was the statement he made to you, if any?

"A. Well, I asked him if he remembered how it happened and he said, 'Sure, I remember how it happened.' He told me that he had stopped the car and got out of the car and as he started to get back in the car, that she shot him, and said, 'Then she shot me the second time before I could get the gun away from her'. Then he said he hit her beside of the head and knocked her out and he either put the gun under the front seat or in the back of the car, he didn't remember which. Then he drove to the hospital."

The last remark voiced in the presence of and testified to by both sisters and as recited by Ann Gabbert is:

"He said he knew he had to get her and take the gun

from her to keep her from shooting or she would put all of the bullets in him, and he said when he taken the gun from her he either put it under the front seat or in the back seat, he didn't remember. * * * and he said after he taken it from her, it's a wonder he hadn't turned it on her and shot her but he was glad now he didn't do it."

Before these several statements were offered in evidence, Dr. Emmett, an able physician and surgeon who was attending Anderson and who was called by the Commonwealth, had testified that the patient rallied from the immediate shock of his wounds to such an extent that the doctors were hopeful of his ultimate recovery. That witness said:

"* * * he responded very completely to restorative measures and we hoped that his abdominal problem was not particularly severe. It was a day or two—two or three days in the convalescence in which it appeared that he was going to get by all right."

The Chief of Police of Clifton Forge had testified that he interviewed Anderson several times. His first interview was on Sunday night just after the patient had regained consciousness; the others were on occasions over a period of three or four days. On the first visit, in response to an inquiry as to who shot him, Anderson answered, "I haven't been shot." On the subsequent interviews, he made the same or a similar reply to each inquiry about who shot him. The witness says that Anderson "left him under the impression that no one had·shot him."

Other testimony given by Ann Gabbert, relative to what Anderson said at a late hour on Sunday night and after the first alleged dying declaration had been made, is somewhat contradictory of or at variance with his announced belief and apparent conviction that he was dying. It is:

· "Well, he was telling me about her shooting him up there in his arm and then, later on in the night, he said he felt pretty good, when the nurse asked him how he felt, he said he felt pretty good except his stomach hurt him so bad. And she said, 'Don't you know why your stomach

hurts'? And he sort of looked at her. And she said, 'Well, you've been shot in the stomach.' And he sort of looked at her like he didn't know what she meant."

It is definitely true that deceased received a mortal wound and that his life could not have been saved. When the first statement was made it was but a short time after he had regained consciousness from the immediate shock of the wound. He was in pain, vomiting and perspiring. In truth and in fact, he was then *in extremis* though his death did not occur for slightly more than five days.

■■ While there are some slight circumstances tending to refute the contention that he then contemplated early death, the above recited facts, coupled with the expressed meaning of the declaration, justify the conclusion that he was *in extremis*, known to him and that he then despaired of all hope and expectation of recovery. That he was in the immediate presence of the Grim Reaper is factually true. Fairly construed, his voiced belief and conviction was, "I have a rendezvous with Death * * *" and that appointed hour is before tomorrow's dawn.

The circumstances proved incident to Sunday's statement constitute the necessary foundation for its introduction as a dying declaration and measure up to the test deemed requisite by Professor John B. Minor, at p. 288, in his Exposition of the Law of Crime and Punishment:

"Dying declarations are admissible only in case of homicide, when made by the person injured touching the cause of his death, while actually *in extremis*, and conscious that he is so, under a sense of impending death, and without any expectation or hope of recovery."

In an opinion by Judge Keith, which concurs in the result in the case of *Patterson* v. *Commonwealth*, 114 Va. 807, at p. 819, 75 S. E. 737, it is said:

"Whether or not a dying declaration is admissible depends largely upon the mental condition of the declarant. If a man who has received a wound believes that wound to be mortal and that he will shortly die of it, his declaration is

admissible, and I know of no way in which his mental attitude can be ascertained except by what the declarant may say and do."

Because Anderson's life was prolonged for several days does not of itself render the statement inadmissible. It does not alter the certain fact that he was actually *in extremis*, nor can it change his then conviction that he was dying.

Upon this immediate question in Wigmore on Evidence, Vol. 5, 3rd Ed., sec. 1441, p. 235, is this pertinent paragraph:

"But the *actual period of survival* after making the declaration is immaterial. The necessary element is a subjective one,—the declarant's expectation; and the subsequent duration of life, whatever it may turn out to be, has no relation to his state of mind when speaking."

Thus we find no error in the admission in evidence of Sunday's statement.

Because Anderson was conscious of impending death on Sunday night and then entertained no hope of recovery does not in and of itself establish a similar mental attitude on Monday or Thursday.

In discussing whether proof of the necessary mental status —consciousness of impending death without hope of recovery—having been shown to exist at one time will be presumed to continue to a later date and render a declaration at such subsequent time admissible, Dean Wigmore, *supra*, says in sec. 1439, at p. 232:

"This consciousness must of course have been *at the time of making the declaration*.

"It follows, on the one hand, that a *subsequent change* of this expectation of death, by the recurrence of a hope of life, does not render inadmissible a prior declaration made while the consciousness prevailed, although a repetition of the declaration during the subsequent inadequate state of mind would not be admissible. * * *."

There is no actual proof that Anderson was certain of impending death when he voiced the last two statements. What hope or lack of hope concerning recovery or approach-

ing death was then entertained is left wholly within the realm of presumption.

"The rule of law is now well settled, that to render dying declarations admissible evidence, they must be shown to have been made when the declarant is under a sense of impending death, and without any expectation or hope of recovery." *Bull* v. *Commonwealth*, 14 Gratt. (55 Va.) 613, 620.

And in *Compton* v. *Commonwealth*, 161 Va. 980, at p. 985, 170 S. E. 613, we find:

"Mere belief in the possibility, or even the probability, of death is not sufficient; there must be a certainty of it eventually."

■ This conviction of impending death must be proved to have been entertained by the declarant when the statement was made.

It is of importance that in neither of the latter statements is there any indication that Anderson then entertained belief that he was dying. In them is found nothing prompting the thought, much less proving, that he was devoid of all hope of recovery. They contain nothing but recitals by whom and how the wounds were inflicted, without reference to his condition or indication of his then mental attitude.

Nor is the necessary proof of then consciousness of impending death and hopelessness of recovery supplied by any other facts or circumstances in evidence. Such a mental attitude is rather negatived by other testimony. For some three days during Anderson's illness, Dr. Emmett entertained real hope and belief that he would recover. For all we know, that belief and hope might have been enjoyed by Anderson.

■ It is not incumbent upon accused to prove that the required belief and mental status shown to have existed on a previous day or time has been altered and so establish that the declaration is inadmissible. On the contrary, the burden is upon the Commonwealth to convincingly prove that the requisite belief and mental attitude existed at the time the alleged declaration was made.

■ The evidence falls short of establishing the proper foundation for admission of Monday's and Thursday's statements as dying declarations.

■ Nor can we agree with the Attorney General's contention that "all three statements were substantially the same" and that if the declarations of Monday and Thursday are strictly inadmissible they were but a repetition of Sunday's statement and their admission was harmless error.

The two latter remarks, though similar in some respects to that of Sunday, enter into more detail and materially add to the earlier declaration. In addition, Monday's and Thursday's pronouncements are both testified to by Wanda Anderson, who was not present Sunday, and thus the testimony of Ann Gabbert as to Sunday's declaration is corroborated and made more convincing by another witness.

Accused also contends that reversible error was committed when the court refused to admit certain testimony of her husband, Randolph G. Batten, which, she says, tended to refute evidence introduced to establish motive and intent on her part to kill her paramour.

It was proved by the Commonwealth that while Randolph G. Batten was in service and absent from his home for a period of some two years, accused and Anderson became much interested in each other. Their affection was shown to have been mutual and throughout the ensuing years they often lived together as though they were husband and wife. Thus the Commonwealth convincingly established the existence of that "age old and eternal triangle."

Upon Batten's release from service and return to his home in the summer of 1945, though he learned of his wife's intimacies with Anderson, he and she resumed marital relations for a short period. This reconciliation, however, was of brief duration. Within a week or two accused and Anderson began again their close associations. She secured a divorce *a mensa et thoro* and she and Anderson contemplated marriage when an absolute divorce could be obtained. They purchased a lot for which each paid half of the purchase

price and it was conveyed to them jointly. Their expectation was to erect a residence thereon in which to live after their marriage. On the day Anderson was shot, he and accused were returning from a week-end trip spent together and on that afternoon and evening, both had indulged in the use of intoxicants, Thus their intimate relations are shown to have continued until the day of the tragedy, though there is definite testimony that shortly prior thereto each had become much less enamoured of the other.

To sustain the theory of wilful and intentional homicide, the Commonwealth introduced testimony tending to prove that accused was jealous, angered and vindictive toward Anderson because she had learned that he had become interested in a woman in Kentucky and was paying to her marked attention.

The evidence in this respect definitely indicated that Anderson had in fact transferred his affection and attentions to another. It denoted that he was tiring of accused and did not wish to marry her, and that she was aware of his desire to reject her and had thereby been angered. The possible, if not probable, effort of jealousy, hatred and anger so engendered on the part of accused was thus conveyed to the jury and motive and intent shown. In this permissible manner, the jury was reminded that, "Heaven has no rage like love to hatred turned, nor hell a fury like a woman scorned."

In refutation of this damaging evidence, accused testified that she had decided to cease her association and intimacies with Anderson, and that she and her husband had agreed to reestablish their home and resume life together, but as a condition of such reconciliation, he required that she sell her interest in the lot to Anderson or buy his. She further said that in accordance with Anderson's one time expressed willingness to do this she had executed and acknowledged a deed conveying her interest to him, and when she insisted on the consummation of the transaction he became enraged, threatened to kill her, and exclaimed, "I know why you want me

to pay you for that lot. You want to go back to that damn son-of-a-bitch." He then drew a pistol and pointed it at her with a declared intent to kill her, whereupon she attempted to defend herself by grabbing his arm, "to get the gun pointed from me." In the ensuing struggle over the pistol, she contends it was twice accidentally discharged.

Yet when the testimony of her husband was offered in aid and corroboration of this agreement, intent and desire on his and her part to become reconciled and that the discontinuance of the joint ownership of the lot was a condition to its consummation, this evidence was disallowed.

The testimony of accused was admitted to refute that offered by the Commonwealth to establish motive and intent to kill. Similarly, the testimony of the husband corroborating her claim that she desired and intended to discontinue her improper association and intimacies and that he and she intended to and would reestablish their home and live together as soon as all relations with Anderson were severed, including the joint ownership of property, would weaken the Commonwealth's claim of jealousy, anger and vindictiveness on her part toward Anderson and disprove motive and intent to kill.

Rejection of this evidence constituted error, and may have been prejudicial to accused.

For the reasons stated, the judgment of conviction is reversed and a new trial awarded.

*Reversed and new trial.*