## Richmond

James Wilson Kuckenbecker v. Commonwealth of Virginia.

January 20, 1958.

Record No. 4757.

Present, All the Justices.

The opinion states the case.

*Richard B. Kellam* (*P. W. Ackiss; Kellam & Kellam*, on brief), for the plaintiff in error.

*Reno S. Harp, III, Assistant Attorney General (Kenneth C. Patty, Attorney General,* on brief), for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

James Wilson Kuckenbecker, indicted for the murder of his father, Otto Kuckenbecker, was tried by a jury which found him guilty of voluntary manslaughter and fixed his punishment at confinement in the penitentiary for five years. To review the judgment entered upon the verdict we granted a writ of error.

In his assignments of error the accused attacks the sufficiency of the evidence to sustain the verdict, the admissibility of certain evidence, and the lower court's rulings on the instructions. Because under our view of the case there must be a new trial, it is unnecessary that we pass upon the sufficiency of the evidence and we shall relate only so much thereof as pertains to the matters decided.

At the time of his death on January 28, 1956, Otto Kuckenbecker was seventy-five years of age. For several months prior thereto he, his son, James, aged forty-five, and the latter's daughter, aged five, had been living at the Waverly Hotel at Virginia Beach. James was unemployed and he and his daughter were supported by the elder Kuckenbecker who paid their bills at the hotel. The evidence on behalf of the Commonwealth tended to show that because of this situation there had been frequent quarrels between the father and son, during which the son had struck his father on at least two occasions. The accused son admitted that these quarrels had taken place, but denied that he had wilfully struck his father on any occasion.

Robert L. Strohorb, the manager of the hotel, testifying for the Commonwealth, stated that at about 9:30 p. m. on January 28, on returning from a near-by drugstore he found Otto Kuckenbecker standing at the top of the hotel steps. Kuckenbecker was pale, breathing hard, and holding his hand on his chest. He beckoned to Strohorb and asked him to go into the front lobby. They went into the lobby and Kuckenbecker sat down on a sofa and as Strohorb said, "we talked a few minutes," and "I asked him what had happened." Over the objection of counsel for the accused, Strohorb was permitted to testify that in response to this inquiry Kuckenbecker said that "he and Jim had been in a fight and Jim had hit him in the chest."

Continuing, Strohorb said, "I asked him if I could call a doctor

and he said it was not necessary. He asked for a drink of water and I went down and got him a glass and brought it back, and when I got back he had thrown his head back and was breathing hard, and I went and called a doctor."

Dr. Robert B. Webb, a local physician, in response to Strohorb's call, reached the hotel, as he said, "at approximately 9:50 p. m." He found that Kuckenbecker was dead. In his opinion, death had occurred at 9:45 p. m.

An autopsy showed that death had resulted from a hemorrhage from the rupture of the large artery leading from the heart. Fractures of the fourth and fifth ribs had torn the artery, causing the hemorrhage. The body also showed hemorrhages over the surface of the liver and around the right kidney.

The Commonwealth's theory was that Otto Kuckenbecker's fatal injuries were caused by a malicious and brutal assault by his son, the accused.

Grover Turner, a night clerk on duty, was at his desk in the lobby when Strohorb returned to the hotel from the drugstore and during Strohorb's conversation with the elder Kuckenbecker. Turner was not called as a witness because, it was said, he had left the employ of the hotel and his whereabouts was unknown.

The accused testified that he visited his father's room about 8:30 or 8:45 p. m. to deliver a bill which he, the accused, had received from the hotel and stayed there for about ten or fifteen minutes. He denied that there was any altercation between them on that occasion. He testified that when leaving his father's room he found the door "stuck," that it was necessary to use force in opening it, and that in doing so "the door flew open and my elbow bumped him." Apparently, he said, his father was not seriously hurt by the blow.

The principal assignment of error is that the lower court erred in admitting Strohorb's testimony as to the declaration of the deceased, that "he and Jim had been in a fight and Jim had hit him in the chest." The contention is that this declaration was hearsay and not admissible as a part of the *res gestae*. The record shows that the lower court at first excluded the declaration on this ground but later admitted it and confirmed the latter ruling in its written opinion overruling the motion to set aside the verdict.

The time of the alleged assault is not fixed precisely by the evidence. The only direct evidence on the subject comes from the accused. According to his testimony, the fatal blow was received as

the accused was leaving his father's room between 8:40 and 9:00 p. m. The time of the declaration is fixed by Strohorb at a few minutes after 9:30 p. m., after he and the elder Kuckenbecker had gone into the lobby and talked for a "few minutes." Thus from thirty to fifty minutes elapsed between the time of the alleged assault and the deceased's declaration. Death occurred shortly after the declaration and about forty-five minutes or an hour after the alleged assault.

[█] Numerous cases have been before this court involving the admissibility of declarations as part of the *res gestae*, and while the principles are well settled the application in the particular case often proves difficult. For a general discussion of the subject and a collection of cases from this jurisdiction, see 7 Mich. Jur., Evidence, § 259 *ff.*, p. 642 *ff.*

The admission of evidence of an extra-judicial statement as a part of the *res gestae* is an exception to the hearsay evidence rule. Such a statement is admitted upon the principle that, "The spontaneity of the utterance is the guaranty of its trustworthiness in substitution of that provided by oath and cross-examination." *Chappell* v. *White,* 182 Va. 625, 633, 29 S. E. 2d 858, 861. While the statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation. It must not be a mere narrative of a past, completed affair. *Chappell* v. *White, supra,* 182 Va., at page 633, 29 S. E. 2d, at page 862. See also, *Sutton* v. *Sutton,* 194 Va. 179, 187, 188, 72 S. E. 2d 275, 280.

But, again, it is often difficult to say whether the proffered statement is sufficiently near in point of time to the main event to be a part of the *res gestae* or is merely a narrative of a past occurrence. "Generally, in order for a declaration to be admissible as a part of the *res gestae,* it must be the spontaneous utterance of the mind, while under the influence of the transaction, the test being whether the declaration was the facts talking through the party or the party talking about the facts." 7 Mich. Jur., Evidence, § 262, p. 646. See also, *Upton* v. *Commonwealth,* 172 Va. 654, 659, 2 S. E. 2d 337, 339.

A simple illustration of a declaration, held to be admissible as a part of the *res gestae,* is the outcry of a wounded man at the time he is shot, giving the name of his assailant. *Andrews* v. *Commonwealth,* 100 Va. 801, 806, 40 S. E. 935.

[█] Tested by these related principles we hold that the statement

of the deceased was not admissible as a part of the *res gestae*. It was, of course, not contemporaneous with the alleged assault, the main event, but occurred from thirty to fifty minutes thereafter. It was not a spontaneous utterance at the time the assault occurred. It was a narrative of a past occurrence, a completed affair, made after the deceased and Strohorb had talked for a few minutes and after, as Strohorb testified, "I asked him what had happened." Thus, in response to Strohorb's inquiry, the injured man was "talking about the facts" and narrating what had occurred nearly an hour earlier.

Complaint is made that the lower court erred in granting, at the instance of the Commonwealth, instructions on murder in the first and second degree. It is not necessary that we pass upon this assignment because the conviction of the accused of the lower offense of voluntary manslaughter is an acquittal of the higher offenses of first and second degree murder. Code, § 19-222; *Taylor v. Commonwealth*, 186 Va. 587, 589, 590, 43 S. E. 2d 906, 908. Hence, upon a new trial there will be no instructions relating to the higher offenses.

We find no error in the lower court's clarifying modification of Instruction 1-D complained of.

Nor was there error in the refusal of the lower court to grant Instruction 4-D. The matter therein dealt with was sufficiently covered by the instructions granted at the request of the accused.

Because of the error of the lower court in admitting in evidence the statement of the deceased to Strohorb, under the stated circumstances, the judgment is reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and remanded.*