## Arlington

STEVEN LEE CLARK

v.

## COMMONWEALTH OF VIRGINIA

No. 0150-85

Decided December 2, 1986

COUNSEL

N. Randolph Bryant (Hall, Monahan, Engle, Mahan & Mitchell); James R. Larrick (Anderson, Larrick & Larrick), for appellant.

Margaret Poles Spencer, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

KEENAN, J. — Steven Lee Clark was convicted of first degree murder, conspiracy to commit robbery, attempted robbery and use of a firearm in the commission of murder. He was sentenced in accordance with the jury's verdict to life imprisonment for murder, ten years for conspiracy, ten years for attempted robbery and two years for use of a firearm. The issues presented in this appeal are: (1) whether the court erred in allowing testimony regarding statements made by the victim describing his assailant; and (2) whether the court erred in allowing the prosecutor to comment on this testimony during the rebuttal portion of his closing argument. We find that the court erred in ruling that the victim's statements were admissible under the spontaneous utterance exception to the hearsay rule; however, we find that the statements were properly admissible under the dying declaration exception. We also find that the court did not err in allowing the prosecutor to comment on the testimony regarding the victim's statements during rebuttal argument. Accordingly, we affirm the convictions.

## I. FACTS

The evidence at trial established that Clark and two companions, Billy Mauck and Jerry "Buddy" Strawderman, conspired to rob Clark's former co-worker, Garland McDonald. The three men went to McDonald's trailer at approximately 8:00 p.m., on the evening of January 28, 1984, with the expressed intention to rob McDonald. Clark was armed with a .22 caliber rifle. The trailer was located behind Weber's Nursery off of Route 11 in Frederick County. Also located near McDonald's trailer was a Big Red service station. McDonald was a caretaker at Weber's Nursery. Clark had also worked at the nursery and lived for a short time with McDonald.

When Clark and his companions arrived at the trailer, Clark knocked on the door and was admitted by McDonald. Shortly thereafter, within five to ten minutes, Mauck also entered the trailer and was introduced to McDonald by Clark. Mauck testified that Clark went to use the bathroom a few minutes after he (Mauck) arrived and took the gun with him. According to Mauck, when Clark returned he motioned to Mauck to move from where he was sitting. Clark then gave the gun to McDonald and said: "How do you like my new gun?" McDonald replied: "It is a nice gun." Mauck further testified: "[Clark] looked over at me and looked back and set the gun up and he pointed the gun and shot him (McDonald) in the chest." Mauck estimated that the gun was approximately two and one-half feet from McDonald at the time Clark fired.

Mauck testified that McDonald got up after being shot and moved toward Clark who began to reload the gun. Mauck ran from the trailer and heard a second shot after he was outside. Strawderman, who remained outside, ran with Mauck to their car. As they were running, they heard two more shots coming from the trailer. Strawderman testified that Mauck and Clark were inside the trailer for no longer than five minutes prior to the shooting.

After Mauck and Strawderman got back to the car, Clark joined them within two minutes. Strawderman testified that Clark said to them: "I shot my ex-boss." The three men drove a short distance, but turned around to return to the trailer because Clark wanted to make sure that McDonald was dead. Strawderman tes-

tified that when they returned to the trailer, Clark looked inside and saw that McDonald was not there. They then heard sirens and saw lights flashing in the direction of the Big Red service station. Mauck estimated that approximately five minutes elapsed from the time they initially ran from the trailer to the time they returned and found that McDonald had left. Strawderman estimated this time to have been ten minutes. Upon seeing the flashing lights, the three men again left the trailer and made their way to a friend's house.

Robert West, the manager of the Big Red station, testified that he saw McDonald enter the station at approximately 8:20 p.m. on that evening, with blood on his arm and a knife in his hand. West asked him: "What happened, were you in a fight, did someone try to rob you? What is the matter, Mac?" Over defense counsel's hearsay objection, West was allowed to testify that McDonald said: "The tall boy, the tall boy that used to work at Weber's." West also testified that McDonald told him to call the police. The court allowed this testimony on the ground that it came under the spontaneous utterance exception to the hearsay rule.

Deborah Light, a clerk at the Big Red station, testified that McDonald came to the station at 8:20 that evening. She testified that McDonald told them he needed help. She further testified that McDonald was having trouble breathing and that he laid down. When he sat up, Light noticed blood on his shirt. According to Light, McDonald said: "The tall boy at the nursery did it."

Both Light and West testified that McDonald appeared calm. Light testified that when McDonald realized he was frightening them, he told them he was not going to hurt them and put his knife down. However, West testified that McDonald "obviously was hurt and in pain." Immediately after calling the police, West called the rescue squad because Light informed him that McDonald was "hurt pretty badly."

Deputy Joey Henry of the Frederick County Sheriff's Department testified that he responded to a call from the Big Red station at approximately 8:30 p.m. Henry stated that when he arrived, he raised McDonald's shirt and saw a small hole and large areas of blood. Henry also observed an injury to McDonald's hand. When the rescue squad arrived and took McDonald to the hospital, Henry accompanied him. Henry testified that during this time

McDonald "was primarily unconscious although he came more of a semi-conscious state and more or less acted as being in some type of agony or something like that." Henry further testified: "[McDonald] would raise up out of the stretcher which he was on. He would, you know, cry out. But he never made any, said any words of anything like that, you know, that were legible."

Dr. Joseph Deignan, a surgeon, testified that he examined McDonald at the Winchester Medical Center at approximately 8:30 to 8:40 p.m. that evening. He stated that at this time McDonald was "in an almost death-like state or predeath-like state." Deignan stated that McDonald had two chest wounds and a wound in the right wrist. After attempting to revive McDonald for approximately one hour without success, Deignan pronounced McDonald dead. Dr. James Beyer performed an autopsy on McDonald. Beyer testified that McDonald sustained three gunshot wounds, two of which he characterized as "lethal" because of resulting blood loss and damage to the liver and left lung.

Rocco Ricky, an investigator with the Frederick County Sheriff's Department, investigated the crime. He testified that in inspecting the area between the Big Red station and McDonald's trailer, he found "a path of blood leading from the door of the entrance to the trailer down alongside of the trailer which led to another building which is associated with the nursery and it subsequently led to the office of the Big Red service station." Later testimony established that this trail covered 492 feet.

Clark testified in his own behalf. His version of the events was that Mauck picked up the gun and shot McDonald. Consistent with this theory, Clark's attorneys attacked the credibility of prosecution witnesses Mauck and Strawderman during closing argument. In rebuttal, the prosecutor sought to rehabilitate his witnesses by citing other evidence that was consistent with their testimony. The evidence cited included the statements made by McDonald. Defense counsel objected on the ground that he had not referred to McDonald's statements during his closing argument. The court overruled the objection, stating:

I think the Commonwealth could make argument in rebuttal to try to substantiate the credibility of his witnesses and to cite things that would help to overcome the attack of the defense of the credibility of its witnesses. So, I think he can

fairly argue. That wouldn't be new argument, but rebuttal, to cite circumstances that would tend to corroborate or enhance the credibility of witnesses whom the defense has attacked as to their credibility.

## II. *HEARSAY OBJECTION*

■ On appeal, Clark first argues that the court erred in finding that McDonald's statements were admissible under the spontaneous utterance exception to the hearsay rule. We agree. The rule in Virginia is that "[e]xcited utterances prompted by a startling event, and not the product of premeditation, reflection, or design, are admissible, but the declaration must be made at such time and under such circumstances as to preclude the presumption that it was made as the result of deliberation." *Goins v. Commonwealth*, 218 Va. 285, 287, 237 S.E.2d 136, 138 (1977).

■ As the party seeking to establish an exception to the hearsay rule, the Commonwealth had the burden of clearly showing that McDonald's statements were admissible. *Doe v. Thomas*, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984). In *Doe*, the Supreme Court summarized the factors which bear upon the decision to admit evidence under the excited utterance exception. The Court stated:

Although not controlling, the lapse of time between the "startling event" and a declaration offered in evidence is relevant to a determination whether the declaration was spontaneous and instinctive, or premeditated and deliberative. It is also relevant to consider whether the declarant made an exclamation impulsively on his own initiative, or a statement in response to a question. And a further factor in the truthworthiness equation is whether the statement was an admission against interest or a self-serving declaration. The ultimate test is whether it appears that "the facts [were] talking through the party or . . . the party [was] talking about the facts."

*Id.* at 471-72, 318 S.E.2d at 385 (quoting *Upton v. Commonwealth*, 172 Va. 654, 659, 2 S.E.2d 337, 339 (1939)) (citations omitted).

Our review of the facts in the present case convinces us that the Commonwealth failed to carry its burden of proving that McDonald's statements were admissible under the spontaneous utterance exception. The statements were made some five to ten minutes after the shots were fired. During this time, McDonald walked from his trailer to the Big Red station, a distance of 492 feet. Prior to making the statements, McDonald was asked what had happened and whether he had been robbed. Further, the testimony of West and Light indicated that McDonald was calm at the time he made the statements.

The Supreme Court has stated that "while the statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation. It must not be a mere narrative of a past completed affair." *Kuckenbecker v. Commonwealth*, 199 Va. 619, 622, 101 S.E.2d 523, 526 (1958).

Here, the circumstances did not overcome the presumption of deliberation. As in *Nicholaou v. Harrington*, 217 Va. 618, 231 S.E.2d 318 (1977), there was "no suggestion that this was an excited declaration uttered in instinctive reaction to a startling event." *Id.* at 622, 231 S.E.2d at 322; *see also Goins v. Commonwealth*, 218 Va. 285, 237 S.E.2d 136 (1977)(robbery victim's statements made in response to questioning 10 to 15 minutes after police arrived held inadmissible).

The Commonwealth argues, however, that even if the statements were inadmissible as spontaneous utterances they were admissible as dying declarations. Under the holding in *Thims v. Commonwealth*, 218 Va. 85, 93, 235 S.E.2d 443, 447 (1977), the ruling of the trial court may be affirmed on a different basis than that used by the court where the correct result has been reached for the wrong reason.

The rule regarding dying declarations was stated by the Supreme Court in *Hall v. Commonwealth*, 89 Va. 171, 15 S.E. 517 (1892). There the Court stated:

The principle upon which, in cases of homicide, the dying declarations of the deceased are admitted in evidence, is that they are declarations made in extremity, under a sense of im-

pending death, and, therefore, when every motive to false-hood is silenced. It is not necessary, however, that they should be stated, at the time, to be so made. It is enough if it appears that they were made under that sanction; and, when this is shown, the length of time between the declarations and the death of the declarant is an immaterial matter.

*Id.* at 176-77, 15 S.E. at 519.

■ In *Batten v. Commonwealth*, 190 Va. 235, 56 S.E.2d 231 (1949), the Court stated: " 'The rule of law is now well settled, that to render dying declarations admissible evidence, they must be shown to have been made when the declarant is under a sense of impending death, and without any expectation or hope of recovery.' " *Id.* at 243, 56 S.E.2d at 235 (quoting *Bull v. Commonwealth*, 55 Va. (14 Gratt.) 613, 620 (1857)).

■ "Mere belief in the possibility, or even the probability, of death is not sufficient; there must be a certainty of it eventually." *Compton v. Commonwealth*, 161 Va. 980, 985, 170 S.E. 613, 615 (1933). The declarant's consciousness of his impending death "may be established otherwise than by [his] . . . statements . . . as by the character and nature of the wound, his appearance and conduct." *Hill v. Commonwealth*, 43 Va. (2 Gratt.) 594, 608 (1845).

We agree with the Commonwealth that under the evidence presented at trial, McDonald's statements were admissible under the dying declaration exception. At the time the statements were made, McDonald had been shot three times. Two of the wounds were to the chest, causing damage to his liver and left lung. McDonald was having trouble breathing and, according to West, was in obvious pain. Shortly after making the statements, McDonald lapsed into semi-consciousness. He appeared to be in agony on the way to the hospital and made no further statements. He died shortly thereafter.

While it is true that McDonald never stated his belief that death was upon him, the serious nature of his wounds and the absence of any statements or actions on his part manifesting an expectation of recovery were sufficient circumstances to demonstrate that he possessed such a belief.

■ To be admissible as dying declarations, the statements also must relate to the facts and circumstances which caused the death. *Pendleton v. Commonwealth*, 131 Va. 676, 697, 109 S.E. 201, 209 (1921); *Patterson v. Commonwealth*, 114 Va. 807, 816, 75 S.E. 737, 740 (1912). McDonald's statements referred to the identity of the killer and, as such, were admissible.

We hold, therefore, that although the court admitted the statements under an incorrect theory, the statements were nevertheless admissible and were properly before the jury. Accordingly, the court's judgment will not be disturbed.

### III. *CLOSING ARGUMENT*

■ Clark argues that it was improper for the prosecutor to refer to McDonald's statements in rebuttal when defense counsel made no reference to them in his closing argument. We disagree. It is apparent from a reading of the entire argument that the prosecutor was citing evidence in the record that supported the testimony of Mauck and Strawderman. Since defense counsel devoted much of his closing argument to attacking the credibility of these witnesses, the prosecutor was entitled to rehabilitate them on rebuttal. It is irrelevant that defense counsel did not refer to McDonald's statements. "In rebuttal argument, a prosecutor has the right to *answer the argument* made by defense counsel and to refer to *evidence* and fair inferences suggested by the *evidence touching the subjects* covered by the adversary." *Clozza v. Commonwealth*, 228 Va. 124, 137, 321 S.E.2d 273, 281 (1984), *cert. denied*, 105 S. Ct. 1233 (1985)(emphasis added).

In summary, we find that the court did not err in allowing the prosecutor to refer to McDonald's statements during rebuttal argument and that although the court erred in admitting McDonald's statements under the spontaneous utterance exception, they were, nevertheless, admissible as dying declarations. Finding no reversible error, the judgment of the trial court will be affirmed.

*Affirmed.*

Benton, J., and Duff, J., concurred.