# STEVEN LEE CLARK

## V.

# COMMONWEALTH OF VIRGINIA

Record No. 870187

April 22, 1988

Present: All the Justices

*James R. Larrick, Jr.; N. Randolph Bryant (Anderson, Larrick & Larrick; Prosser, Parthemos & Bryant, P.C.,* on brief), for appellant.

*Eugene Murphy, Assstant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this criminal appeal, the sole question is whether a hearsay statement uttered by the victim of a homicide properly was admitted in evidence at trial.

In 1985, appellant Steven Lee Clark was sentenced by the Circuit Court of Frederick County to life imprisonment for first-degree murder, ten years for conspiracy to commit robbery, ten years for attempted robbery, and two years for use of a firearm in the commission of murder. The defendant previously had been found guilty by a jury of those charges.

Subsequently, the Court of Appeals affirmed the convictions. *Clark* v. *Commonwealth,* 3 Va. App. 474, 351 S.E.2d 42 (1986). We awarded the defendant this appeal.

The foregoing charges arose from an incident occurring January 28, 1984. The defendant, age 24, and two accomplices, Jerry

Lee Strawderman, age 17, and Billy Mauck, age 15, planned to rob Garland McDonald, age 69, to obtain funds to purchase whiskey. The defendant and the victim previously had worked together at Weber's Nursery near Winchester. The victim lived alone in a house trailer near the nursery and the Big Red Service Station, "a combination service station and grocery store."

About 8:20 p.m. on the day in question, defendant, Strawderman, and Mauck travelled to the victim's home in Mauck's automobile. Defendant, armed with a .22-caliber rifle, and Mauck entered the trailer upon the victim's invitation. After talking with the victim for several minutes, according to the Commonwealth's evidence, defendant fired three shots that struck the victim in the left chest, the right chest, and right hand and arm. Defendant testified that Mauck fired the shots.

After the shooting, the three conspirators fled the scene in the automobile. After a few minutes, they returned to the trailer because defendant "wanted to get rid of the body." According to Strawderman, they arrived back at the trailer "[a]bout ten minutes" after the shots were fired. Mauck testified that "about five minutes" had elapsed before they returned to the scene.

In the meantime, the victim had walked from his home, leaving a trail of blood in snow, to the Big Red store, a distance of 492 feet. Robert West, manager of the store, saw the victim, a "regular customer," as the victim entered the establishment at "approximately 8:30, 8:40 p.m."

According to West, the victim had his "arm raised slightly," there was blood on his arm, and he was carrying a knife. West said to the victim, " 'What happened, Mac? What is the matter?' " According to West, the victim "grimaced a little bit" and "he obviously was hurt and in pain." The victim then "veered away" from a store counter and stood next to cigarette shelves. The victim did not respond to West "at first." West repeated, " 'What happened, were you in a fight, did somebody try to rob you? What is the matter Mac?' "

The victim then gave the response that West related to the jury, over defendant's objection, which generated this appeal. The victim said, " 'The tall boy, the tall boy that used to work at Weber's." He then said, " 'Tell Jerry' " (the nursery manager) and " 'Call the police.' " According to the record, defendant's height was at least six feet.

Deborah Light, a clerk at the service station, also was present when the victim entered the store. She testified that "about" 8:20 p.m. the victim "came in and told us . . . he needed help." According to Light, the victim "had trouble breathing" and "he laid down" and then "sat back up." At this time, she noticed "blood from the front of his shirt." Over defendant's objection, she related to the jury what the victim said to West. According to Light, the victim "kept telling us to call Jerry and he said, 'The tall boy at the nursery did it.' "

On cross-examination, Light stated that the victim "was coherent" and "conscious" when he entered the store. She said that he realized "he was frightening us" by holding the knife and "he told us that he wasn't going to hurt us and he laid the knife down." Light answered affirmatively to questions whether the victim "seemed rather calm" and whether "he was able to deliberate, was able to understand what he was saying." West answered affirmatively to the question whether the victim appeared to be "relatively calm" at the time.

According to West, he called the police who arrived at the store "a lot faster than I thought." The victim immediately was transported to the Winchester Hospital. Meanwhile, defendant and his accomplices fled the scene because they observed, from their position near the victim's home, the police and other emergency vehicles at the service station.

A physician examined the victim in the emergency room of the hospital at "approximately 8:30, 8:40 p.m." He described the victim as "an elderly man in extremis." He was "in an almost death-like state, or predeath-like state" and was "in shock." The physician examined the victim's wounds and concluded that, "because he was in such profound shock," his heart or a "great vessel" had been penetrated by a bullet. All attempts to revive and resuscitate the victim failed and he was pronounced dead within an hour after he reached the hospital.

The trial court admitted the challenged testimony, in which the victim identified defendant as his assailant, on the ground it qualified as an exception to the hearsay rule because it was "a spontaneous utterance." Upon review, the Court of Appeals decided that the trial court "erred in finding that McDonald's statements were admissible under the spontaneous utterance exception to the hearsay rule." 3 Va. App. at 480, 351 S.E.2d at 45. The Court of

Appeals held that the "statements were admissible under the dying declaration exception." *Id.* at 482, 351 S.E.2d at 46.

■ Under this exception, dying declarations are admissible evidence in homicide cases if they were made when the declarant was "under a sense of impending death, and without any expectation or hope of recovery. Whether so made or not, is a preliminary question to be determined by the court on all the circumstances of the case." *Bull* v. *The Commonwealth*, 55 Va. (14 Gratt.) 613, 620 (1857). The fact that the declarant was conscious of his condition "may be established otherwise than by the statements of the decedent: as by the character and nature of the wound, his appearance and conduct, etc." *Hill* v. *The Commonwealth*, 43 Va. (2 Gratt.) 594, 608 (1845).

Therefore, the Court of Appeals affirmed the convictions, stating that the trial court had reached the correct result for the wrong reason. 3 Va. App. at 481, 351 S.E.2d at 45.

In the present appeal, the Attorney General argues "the statement of the deceased was properly admitted as an excited utterance and a dying declaration." Alternatively, the Attorney General contends that admission of the statement, "if error at all, was clearly harmless," in view of the overwhelming evidence of defendant's guilt.

The defendant, agreeing that the Court of Appeals correctly ruled out the statement on excited utterance grounds, contends it erred in deciding the statement was admissible as a dying declaration. During oral argument, counsel for defendant contended that neither exception applies to warrant admission of the statement and that the respective exceptions are "mutually exclusive, they cannot coexist."

In addition, defendant argues it was unfair for the Court of Appeals to decide the statement was a dying declaration because the prosecutor never attempted to justify its admission on that ground and the trial court never addressed that issue, the statement having been proffered only as a spontaneous utterance. Because no foundation for the dying declaration exception was laid in the trial court, the defendant argues he was denied an opportunity to rebut any such foundation. Defendant says that had it been argued at trial that the statement of the victim was admissible as a dying declaration, evidence concerning his condition and evidence of statements he may have made concerning his hope of recovery "would have been crucially relevant to the trial court's determina-

tion as to whether or not the statement was, indeed, a dying declaration."

▮ We disagree with the Court of Appeals that the statement was not admissible as a "spontaneous utterance." We agree with the Attorney General that the trial court correctly admitted the declaration under that exception to the hearsay rule. Thus, we do not reach for decision the question whether the statement was admissible as a dying declaration. Nor do we reach the issue whether the Court of Appeals misapplied the "right result for the wrong reason" rule of appellate procedure and usurped the trial court's function of deciding the threshold question under the dying declaration exception.

▮ Evidence of an excited utterance is admissible to prove the truth of the matter asserted, as an exception to the hearsay rule, provided the extrajudicial statement is "spontaneous and impulsive." *Upton* v. *Commonwealth*, 172 Va. 654, 657, 2 S.E.2d 337, 339 (1939). The reliability of the statement, ordinarily guaranteed by oath and cross-examination, is furnished by its spontaneity. *Kuckenbecker* v. *Commonwealth*, 199 Va. 619, 622, 101 S.E.2d 523, 526 (1958).

▮ A homicide victim's statement "made a short time after he has been mortally wounded which obviously [has] not been concocted or premeditated charging the defendant with the act" is admissible as an excited utterance. *Huffman* v. *Commonwealth*, 168 Va. 668, 681, 190 S.E. 265, 271 (1937). "Neither time nor distance is conclusive." *Upton*, 172 Va. at 657, 2 S.E.2d at 339. The test is whether the statement is the transaction speaking through the declarant or the declarant speaking about the transaction. *Id.* at 657-58, 2 S.E.2d at 339.

▮ There is no fixed rule by which the question whether the statement is admissible as an excited utterance can be decided. Resolution of the issue depends on the circumstances of each case and "rests within the sound judicial discretion and judgment of the trial court." *Huffman*, 168 Va. at 681, 190 S.E. at 271. That discretion and judgment, of course, is subject to review. Nonetheless, in a doubtful case there "is a presumption in favor of the action" of the trial court. *Id.*

▮ In the present case, the trial judge correctly concluded that "the time frame is quite important, but it is not the only frame of reference in reaching decision on this" issue. "One made unconscious by an assault might be conveyed to a distant hospital and

might long remain in that condition, but if, in struggling back to consciousness, he were to name his assailant, that would be admissible in evidence, for it would be a statement both spontaneous and impulsive." *Upton*, 172 Va. at 657, 2 S.E.2d at 339. *Compare Doe* v. *Thomas*, 227 Va. 466, 472, 318 S.E.2d 382, 386 (1984) (statement made 18 hours after event ruled inadmissible where declarant, although unconscious most of that time, "came and went" negating assertion that declarant was in insensible coma during entire period).

Here, the trial judge properly concluded under the evidence that the statement was made "within as little as five minutes" after the shooting and "quite probably not more or as much as ten minutes after he was shot." In addition, the trial judge accurately decided that the state of the victim's physical condition and emotional stability "must be considered along with the time frame."

The victim had been shot at close range twice in the chest. Trailing blood, he walked 492 feet seeking help. Within five to ten minutes, he was observed to be grimacing, obviously "hurt and in pain." While he seemed to be "coherent," "conscious," and "calm," he "veered away" from a counter as he moved through the store. He "had trouble breathing" and was bleeding from his chest and arm. Although he seemed to be "able to deliberate" and understand what was being said, he was in "profound shock" and appeared "in an almost death-like state" when examined in the hospital within five or ten minutes after he made the statement. Moreover, the statement in issue was not responsive to any question from those in the store. He was asked what had happened and, instead of relating what had occurred, he blurted the identity of his assailant.

■ Considering all the circumstances surrounding the statement, we hold that the trial court properly exercised its discretion in admitting the declaration as an excited utterance. The victim had been mortally wounded, he was suffering from the trauma, he was in or approaching a state of shock, and his emotional stability was tenuous at most. The statement was not a mere narrative of a completed affair. Rather, it was part of the instinctive reaction to a horrifying event.

The statement is in marked contrast to those held inadmissible in *Goins* v. *Commonwealth*, 218 Va. 285, 237 S.E.2d 136 (1977), and *Nicholaou* v. *Harrington*, 217 Va. 618, 231 S.E.2d 318 (1977), cases cited by the Court of Appeals. In *Goins*, the decla-

rations of a deceased robbery victim were made more than 15 minutes after the event and after a police investigator had questioned the declarant about the crime. In *Nicholaou*, arising from a motor vehicle accident, the statements were made by an unknown witness to the defendant at least six or seven minutes after the event and while the investigating police officer was questioning the declarant about the event.

For these reasons, the orders of the Court of Appeals will be

*Affirmed.*