# CIRCUIT COURT OF AUGUSTA COUNTY

Commonwealth of Virginia

v.

Jerad Michael Ross

Case Nos. CR12000394, CR12000395, and CR13000016

By Judge Victor V. Ludwig

April 1, 2013

Because I recognize that this matter is scheduled for a two-day jury trial next week, I am writing to inform counsel that I am granting Mr. Hill's motion *in limine* to exclude the out-of-court verbal and non-verbal statements by Mr. Jordan. I have nearly completed the opinion describing my reasons for that, but it is unlikely that I will be in a position to deliver it before Wednesday of this week, at the earliest. Nevertheless, regardless of the status of final draft of the opinion, I have made the decision.

Although it was not a part of the motion *in limine*, at the hearing, we also discussed other identifications by witnesses who talked to Investigator Jenkins shortly after the incident. I believe that I made it clear at the hearing that the Court denied Mr. Hill's oral motion made regarding those identifications.

April 5, 2013

Having previously informed counsel of the Court's decision, this letter is to inform counsel of the Court's reasoning for its ruling on the Motion *in Limine* filed by the defendant, Jerad Michael Ross, to exclude statements made by Melvin L. Jordan on May 26, 2012, and May 30, 2012, to Investigator Brian Jenkins of the Augusta County Sheriff's Department. As I stated in the earlier letter, after considering the testimony at the hearing

on March 15, 2013, and the memoranda of law submitted by the parties (the first of which was not filed until the date of the hearing, and the most recent of which was filed on March 19, 2013), the Court will grant Ross' motion.

## I. *Facts*

On May 24, 2012, Jordan sustained multiple gunshot wounds to the leg, stomach, and back that penetrated his internal organs. Jordan was airlifted to UVA Medical Center where he underwent six hours of surgical procedures, after which he was placed in the surgical ICU ward. Late in the afternoon of May 25, 2012, Jenkins received a call from UVA that Jordan "was doing well" and was coming out of sedation. On May 26, 2012, Jenkins arrived at UVA and inquired if he could speak with Jordan. A nurse told Jenkins that Jordan could talk and admitted Jenkins to the surgical ICU where Jenkins observed Jordan lying in a hospital bed. Multiple IVs and wound drains were connected to his body, his leg was in an external fixator, he was receiving oxygen, and he was attached to a heart rate monitor. Jenkins recalled that Jordan's eyes were glazed over, his breathing was labored, and his voice was hard to hear. Jenkins also testified on cross-examination that he believed Jordan was receiving pain medication. In order to "pep him up" for the interview, Jenkins told Jordan that he was "looking good." Jordan did not respond to this comment.

After being shown a photo array, with some physical difficulty in the effort, Jordan identified Ross as the man who shot him by pointing his finger at the appropriate photograph. Nevertheless, Jordan did possess the strength to inquire whether the defendant was in jail and whether he was going to pay for what he had done. It was unclear whether Jordan made any other statements to Jenkins at this time concerning the shooting.

Throughout the interview, Jenkins believed Jordan to be in a great deal of pain, but neither Jordan himself nor any medical professional expressed an opinion concerning Jordan's prospects for survival. Nevertheless, despite the information that he had received the day before that Jordan was doing well, Jenkins testified to a "general feeling" that Jordan would not survive. However, there was no testimony that anyone other than Jenkins subscribed to this belief.

Jenkins subsequently interviewed Jordan on May 30, 2012. Approximately six months later, Jordan died, and the Commonwealth intends to present expert evidence that Jordan died from the wounds inflicted on him on May 24, 2012.

## II. *Analysis*

Ross maintains that Jordan's statements are inadmissible because they were unconfronted testimonial hearsay. The Commonwealth responds that they are dying declarations and are not subject to either the Confrontation Clause or the hearsay exclusionary rule. The Court will address each of these issues in turn.

A. *Crawford v. Washington*

Citing *Crawford v. Washington*, 541 U.S. 36 (2004), and its progeny, Ross asserts that Jordan's statements are testimonial and should be excluded under the Confrontation Clause. Relying heavily on the state of the common law at the time the Sixth Amendment was adopted in 1791, the Court in *Crawford* rejected the reliability test described in *Roberts v. Ohio*, 448 U.S. 56 (1980). *Crawford* at 62–63. Noting that "the Sixth Amendment demands what the common law required," the Court found that the accused must have the opportunity to cross-examine testimonial statements from unavailable witnesses in order for such statements to be admissible. *Id.* at 68. Nevertheless, *Crawford* acknowledged that the common law had traditionally recognized two exceptions to the requirement of confrontation: (1) forfeiture by wrongdoing and (2) dying declarations. Because Jordan's statements are testimonial and were unconfronted, after *Crawford*, the Commonwealth's case for admission rests on these exceptions.

1. *Forfeiture by Wrongdoing*

In *Reynolds v. United States*, 98 U.S. 145, 158 (1878), the Court summarized the forfeiture by wrongdoing exception as follows:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts.

In *dictum, Crawford* explicitly accepted the forfeiture by wrongdoing exception. *Crawford* at 62. However, the Court clarified the scope of the exception in *Giles v. California*, 554 U.S. 353 (2008). In *Giles*, the prosecutor sought to introduce statements made by a murder victim to a police officer responding to a domestic violence call three weeks before the murder. *Id.* at 356–58. Noting that the forfeiture by wrongdoing exception had historically only applied when the defendant's conduct was "designed to prevent the witness from testifying," *id.* at 359, *Giles* indicated that these statements should be excluded. *Id.* at 357, 377. Reviewing the history of the forfeiture by wrongdoing exception to the Confrontation Clause, *Giles* found that:

> The manner in which the rule was applied makes plain that unconfronted testimony would not be admitted without a showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the

> defendant had caused a person to be absent, but had not done so to prevent the person from testifying − as in the typical murder case involving accusatorial statements by the victim − the testimony was excluded unless it was confronted or fell within the dying-declarations exception.

*Id.* at 361–62. Before the shooting, neither Jordan nor Ross appear to have known each other, and, assuming Ross shot Jordan, there is nothing to indicate that he did so to prevent Jordan from testifying against him about the crime. It is possible to construct a scenario in which such testimony might be admissible. If, for example, there were evidence that a defendant shot a victim who told a third party that, after the shooting, he promised the shooter that he would never disclose who had pulled the trigger, but the shooter shot him again (which wounds ultimately caused the victim's death), one could argue that the shooter then intended to silence the victim. Consequently, the forfeiture by wrongdoing exception is inapplicable in this case.

### 2. Dying Declarations

*Crawford* did not reach the question of whether "the Sixth Amendment incorporates an exception for testimonial dying declarations." *Id.* at 56, n. 6. Its progeny also avoided this question. *See Giles* at 358–59; *Michigan v. Bryant*, 131 S. Ct. 1143, 1151, n. 1 (2011). However, *Crawford* cryptically noted, in *dictum*, that "[a]lthough many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. . . . If this exception must be accepted on historical grounds, it is *sui generis*." *Id.* Although this comment seems to reflect some hesitancy by the Court to embrace the dying declarations exception, it nevertheless acknowledged the exception's existence. Later, in *Giles*, the Court was much less hesitant in stating that "[w]e have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. . . . The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying." *Id.* at 358. In *Bryant*, the Court went further by interpreting *Crawford* as "suggest[ing] that dying declarations, even if testimonial, might be admissible as a historical exception to the Confrontation Clause." *Id.* at 1151, n. 1.

Although, after its decision in *Crawford*, the U.S. Supreme Court has fallen short of affirmatively recognizing dying declarations as an exception to the confrontation clause (presumably because the issue has not been squarely presented to it), the Court appears to have recognized that such an exception historically existed at common law. The reasoning of both *Crawford* and *Giles* was grounded in the state of the common law at the time of the founding. *See Giles* at 358 (*quoting Crawford* at 54) ("the Confrontation Clause is 'most naturally read as a reference to the right of

confrontation at common law, admitting only those exceptions established at the time of the founding'."). Consequently, the recognition of the dying declaration exception seems consistent with these opinions. At a minimum, *Crawford* and its progeny steered clear of the dying declaration exception, leaving the state of the law undisturbed.

With that in mind, the Court turns to the applicable Virginia law on the subject. Virginia has long treated dying declarations as an exception to both its own and the federal confrontation clause. In *Hill v. Commonwealth*, 43 Va. (2 Gratt.) 594, 597 (1845), the Court faced the question of whether "the admission of the dying declarations in evidence, is a violation of the bill of rights: the 8th article of which secures to every citizen charged with crime the right to be confronted with the witnesses against him." Obviously, our Supreme Court referred only to the protections afforded by Constitution of the Commonwealth because, at the time, the Sixth Amendment applied only to criminal trials prosecuted by the federal government. The decision in *Hill* was, after all, fifteen years before the beginning of the War and twenty-three years before the ratification of the Fourteenth Amendment. Not until nearly a hundred years after the ratification of the Fourteenth Amendment did the U.S. Supreme Court tease out of that amendment a rationale (undreamt of by those who ratified it) to fashion the "incorporation doctrine" and make provisions of the Bill or Rights, deemed by the Court to be "fundamental and essential to a fair trial," applicable to the States. *See Pointer v. Texas*, 380 Va. 400, 403 (1965) (citing *Gideon v. Wainwright*, 372 U.S. 335, 342 [1963]). The Court concluded that "[w]e are therefore of opinion, that the admission of dying declarations as evidence, is not repugnant to the bill of rights." *Id.* at 608. In the post-*Crawford* era, Virginia Courts have continued to recognize that dying declarations need not be subject to confrontation. *See, e.g., Satterwhite v. Commonwealth*, 56 Va. App. 557 (2010). Consequently, the Court must determine whether Jordan's statements are dying declarations.

## B. *Hearsay*

In a prosecution for homicide, Va. R. Ev. 2:804(b) exempts from the hearsay rule any:

> statement made by a declarant who believed when the statement was made that death was imminent and who had given up all hope of survival, concerning the cause or circumstances of declarant's impending death.

Note the substantive difference between the Rule of Evidence (predicated entirely on the subjective belief of the declarant) and the historical basis for the exception as described by the Supreme Court, which requires an objective fact and a subjective understanding: "The first of [the exceptions]

were declarations made by a speaker who was *both on the brink of death and aware that he was dying.*" *Giles*, 554 U.S. at 358 (emphasis added).

The common law has long admitted dying declarations when the victim found himself in a "state of mortality as would inevitably oblige [him] soon to answer before [his] Maker for the truth or falsehood of [his] assertions," *Giles*, 554 U.S. at 362 (*quoting King v. Woodcock*, 1 Leach 500, 168 Eng. Rep. 352, 353–54 (1789)), because "the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath," *Mattox v. United States*, 156 U.S. 237, 244 (1895).

In order for a Court to find that a dying declaration bears sufficient indicia of reliability to render it admissible, it must find that the statement was made "under a sense of impending death, and without any expectation or hope of recovery." *Clark v. Commonwealth*, 235 Va. 287, 291 (1988) (citation omitted). The declarant's subjective expectation is the necessary element that must be determined. *Batten v. Commonwealth*, 190 Va. 235, 242 (1949). A consciousness of impending death may be established otherwise than by the statements of the decedent. *Satterwhite*, 56 Va. App. at 562 (*citing Hill*, 43 Va. at 608). The party offering the dying declaration bears the burden of establishing the evidentiary basis for its admission by a preponderance of the evidence. *Satterwhite* at 56; *Witt v. Commonwealth*, 215 Va. 670, 674 (1975).

The Commonwealth relies heavily on *Satterwhite* to establish a justification for the Court to admit Jordan's statements as dying declarations. In *Satterwhite*, a woman returned home to find the victim shot three times in the chest and once in the head and lying in a pool of blood. She called 911 and asked the victim who had shot him. *Id*. at 559. Before the paramedics arrived, while bleeding profusely and going in and out of consciousness, the victim identified Satterwhite as the shooter. *Id*. He also told the paramedics that Satterwhite was the shooter after the paramedics arrived on the scene. *Id*. 560. The trial court admitted the victim's identification as a dying declaration, and the Court of Appeals, noting that it is poor public policy to disturb the ruling of a trial judge on whether the victim was conscious of impending death, declined to reverse under an abuse of discretion standard. *Id*. at 564. In finding that the trial court did not abuse its discretion, the Court of Appeals noted that the character and nature of the wounds, the victims' appearance and conduct, and that the victim never expressed an opinion or belief that he would survive were all factors that could indicate the relevant mental state. *Id*. at 562.

The Commonwealth notes three factors as evidence of Jordan's expectation of impending death: (1) his grave injuries, (2) his precarious medical condition at the time of the interview, and (3) and the victim's lack of response to Jenkins statement that he was looking good. The Court puts little weight on the last two factors. First, like this Court, Jenkins

has no formal medical training. While Jenkins certainly possessed the ability to observe Jordan's injuries, his ability accurately to assess medical conditions is doubtful, particularly when a patient is being tended to by medical professionals. Jenkins' assessment of Jordan's medical condition seems to have been influenced, in part, by the amount of medical hardware connected to Jordan's body. In reality, the presence of these devices speaks more to the fact that Jordan had received treatment (likely rendering his state less precarious) than to his chances of survival, particularly in light of the assessment of his condition the previous day when Jenkins learned that Jordan was doing well. Second, Jordan's lack of response to the comment that he was looking good was at best ambiguous. Silence could indicate agreement, irritation with Jenkins' quip, or disagreement. Consequently, Jordan's response was minimally probative of his mental state.

The facts of this case are also distinguishable from *Satterwhite* and many of the other dying declaration cases on two grounds. First, Jordan's statements were made after his condition had been stabilized by medical treatment two days after the shooting. Although he may not have been out of the woods, the emergency had subsided. He had received treatment and was under the close supervision of trained medical professionals. Absent an expression of Jordan's expectation of survival or signs that his condition was worsening, the lapse of time and the rendering of treatment decrease the likelihood that Jordan believed he would die. Second, Jenkins testified that he believed Jordan was receiving pain killers. Pain killers interfere with one's subjective ability to interpret reality. By suppressing the body's signals of distress, pain killers may lead a person to take a more optimistic view of his physical condition than is warranted. In the alternative, pain killers may also interfere with one's ability to even form a view as to one's physical condition. Consequently, Jordan may well have believed himself to be in less peril than the circumstances might suggest. In addition, the effect of pain killers on the mind dilutes the policy reasoning that has led courts to find dying declarations to be reliable. In this case, the Court could infer that the pain killers may have sufficiently insulated Jordan from the sobering effect of death to such an extent that the incentive for truthfulness was removed or diminished. Although the Court would reach the same conclusion regardless of the administration of pain killers to Jordan, it finds that their use further supports its decision.

Simply put, the Commonwealth has failed to establish the necessary evidentiary basis to classify Jordan's statements to Jenkins as dying declarations. Jordan never made a statement indicating an expectation that he would not survive. Although such a statement is not required to trigger the dying declaration exception, the Commonwealth has failed to establish sufficient circumstances for the Court to find that Jordan presumed he was going to die.

Incidentally, because Jordan's statements do not constitute dying declarations, under *Crawford,* they are also inadmissible as such under the Confrontation Clause. In summary, the statements are testimonial, were unconfronted, and are not subject to either of the recognized exceptions to the Confrontation Clause. Consequently, both the Confrontation Clause and the hearsay exclusionary rule bar their admission in this case.

### III. *Conclusion*

Jordan's statements to Jenkins on May 26, 2012, are not dying declarations but rather inadmissible hearsay. At the hearing on March 15, 2013, the Commonwealth conceded that issue as to the statements made by Jordan to Jenkins on May 30, 2012. Accordingly, the Court grants Ross' Motion *in Limine* and excludes both of Jordan's statements to Jenkins.