COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, AtLee and Senior Judge Clements
Argued at Fredericksburg, Virginia

UNPUBLISHED

ARMANDO DAGOBERTO REYES REYES

                                                MEMORANDUM OPINION[*] BY
v.        Record No. 0525-21-4                  JUDGE MARY GRACE O'BRIEN
                                                        JUNE 21, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

Corinne J. Magee (The Magee Law Firm, PLLC, on brief), for
appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Armando Dagoberto Reyes Reyes ("appellant") was convicted by a jury of abduction, in

violation of Code § 18.2-47, first-degree murder, in violation of Code § 18.2-32, concealing a dead

body, in violation of Code § 18.2-323.02, and criminal street gang participation, in violation of

Code § 18.2-46.2.  The court imposed the jury sentence of an aggregate term of life imprisonment

plus twenty-five years, and suspended five years.

Appellant assigns error to the court's rulings concerning the introduction of evidence and

denial of a jury instruction.  He also contends that the evidence was insufficient to establish that he

"participated in murder as a member of a criminal street gang."  For the following reasons, we

affirm appellant's convictions.

_____
[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## BACKGROUND[1]

### A. Pretrial investigation

Sixteen-year-old Richard Hernandez Cruz left his home in Alexandria on April 22, 2019, and never returned. His mother reported him missing, and on May 22 his body was found in a shallow grave in a wooded area of Fairfax County. He had been beaten to death.

After the victim was reported missing, Detective Steven Randazzo obtained search warrants for some of the social media accounts of the victim and his acquaintances, including appellant and Julieth Ford Ortega, the victim's girlfriend. Detective Randazzo and Detective Jeremy Hinson interviewed Ortega multiple times and also scheduled a May 23 interview with appellant. Detectives spoke with another acquaintance of the victim, Cesar Ochoa Carillo, on May 21. Early the next day, Carillo led the detectives to the victim's body.

The victim was covered in mud with a bag over his head. An autopsy revealed that he had seventeen separate injuries to his face and skull. At trial, the medical examiner testified that the victim sustained both external and internal skull fractures, "extensive fracturing to [his] facial bones," and "displaced and fractured" teeth. The medical examiner opined that the injuries were "accomplished by great force," and were consistent with the use of a bat or stick. The victim had bruising and swelling on his forearms and the back of his hands, which appeared to be defensive wounds and indicated he was alive when he sustained the injuries.

Appellant did not appear for his interview with the detectives on May 23. After the victim's body was found, appellant and Ortega fled to Florida, where they were eventually arrested.

---

[1] "Under well established principles of appellate review, we view the evidence and all reasonable inferences deducible from that evidence in the light most favorable to the Commonwealth, the party prevailing below." *Coley v. Commonwealth*, 55 Va. App. 624, 627 (2010).

Appellant gave an extensive statement to Detective Hinson when apprehended. Appellant acknowledged that he was in a sexual relationship with Ortega and they fled to Florida because of the murder investigation. He stated that he and Ortega did not kill the victim, but two high-ranking MS-13 gang members threatened them and ordered him to bury the body. Appellant told Detective Hinson that Carillo helped him bury the victim's body.

On July 1, Detective Hinson re-interviewed appellant. At first, appellant denied killing the victim, denied being a member of MS-13, and claimed that he was just impersonating a gang member.

Appellant changed his story in subsequent interviews and confessed that he killed the victim, who he claimed was performing "black magic" on Ortega to force her to be his girlfriend. Appellant told the detective that he and the victim began fighting, the victim quickly fell to the ground, and appellant hit him multiple times on the head. Appellant described punching and kicking the victim, along with two other men, whom he would not name. According to appellant, the victim died because he was weak, did not know how to fight, and did not get up after he was struck. Appellant also claimed that the victim brandished a knife but did not use it on anyone.

Appellant, who in a previous interview stated that his nicknames are "Dago" and "Sobietikho," also identified social media posts from "his Facebook." He explained that the screen name "Sobietikho13" corresponded to his Instagram account, and although he denied membership in MS-13, he identified himself in a picture making an MS-13 gang sign.

B. Trial

Ortega testified at trial that she and appellant had been in an "on and off" relationship before the murder in April. She stated that she dated the victim in 2018, when they were both sixteen years old.

According to Ortega, appellant was a full-fledged member of the MS-13 gang with a rank of "homeboy." She stated that the two other men involved in the murder, Doroteo Diaz Martinez and Byron Estupianian, were also members of MS-13. Ortega testified that on April 22, 2019, appellant told her that the victim had threatened him and was performing "black magic" upon Ortega because he wanted her to die. Appellant directed Ortega to call the victim and lure him to their location. That evening, Ortega arranged for the victim to take an Uber to her apartment complex.

Before the victim arrived, Estupianian and appellant acquired a metal police baton and a machete and were joined by Diaz Martinez. Ortega testified that when the victim arrived, she hugged him and walked with him toward the woods, where appellant and the two other men surrounded him. Appellant pushed the victim to the ground, and he, Estupianian, and Diaz Martinez began kicking the victim, cursing him, calling him a "rival gang member," and eventually hitting him with something "really big." Appellant told Estupianian that the attack was "revenge" for Estupianian being stabbed by a rival gang a few months earlier. Ortega stated that the victim was crying and screaming during the attack, until things "got quiet." At that point, appellant told Ortega that "things got out of hand" and directed her to stay away from the body so she would not get blood on her shoes. The men carried the victim's body up a hill and hid it.

The next day, Ortega joined the men and Carillo at the murder site. She acted as a lookout as the men buried the body. Afterward, appellant threatened the group and their families if they spoke to the police.

Carillo testified and admitted being a member of MS-13. He described appellant as a MS-13 gang member of a higher rank, known as a "homeboy," which authorized him to give orders. Carillo testified that he helped bury the victim's body because "he was scared and he didn't know what to do." He also identified social media pictures of appellant making gang signs.

- 4 -

According to Carillo, after the men buried the victim's body, appellant told Ortega that she was now "part of the gang."

During the trial, the Commonwealth introduced records for a Facebook account and an Instagram account. Exhibit 17 showed that the Facebook account was registered to "Reyes Flores," and Exhibit 18 reflected that the Instagram account was registered to "Tatiana Reyes" with an email address of sobietikho13@gmail.com. Detective Hinson testified that appellant acknowledged that they were his social media accounts and identified photos of himself from both accounts.

Detective Melissa Wallace testified that she interviewed Ortega the day after the police recovered the victim's body. Appellant sought to elicit testimony that when the detective told Ortega that the victim's body had been recovered, Ortega responded, "Good." The court sustained the Commonwealth's hearsay objection.

Detective Raymond Betts testified as an expert witness in gang activity, with specific focus on the MS-13 gang. He stated that the main goal of MS-13 is to commit violent crimes to intimidate the community. He identified appellant making "MS-13 gang signs" in pictures taken from appellant's social media accounts. When asked "[t]o a reasonable degree of professional certainty, could the evidence in this case indicate that [appellant] is a homeboy in MS-13?" Detective Betts replied affirmatively.

Appellant testified that he posted pictures of himself making MS-13 gang signs on the introduced Instagram account because he "pretended to be a gang member." He denied being in a gang and stated that he and his two accomplices confronted the victim about "putting a black magic hex" on Ortega. According to appellant, Ortega also helped beat the victim. He acknowledged that the men had a machete but said they did not use it. Appellant testified that he merely struck the victim with his fists and Diaz Martinez used a metal police baton to hit the victim. As in his interview, appellant stated that the victim brandished a knife but did not use it. He testified that he

and Diaz Martinez kicked the victim on his back, stomach, chest, and "many times in his face." Appellant confirmed that the men buried the body the next day and destroyed the weapons and the victim's cell phone.

At the end of the case, the court instructed the jury on both premeditated first-degree murder and first-degree felony murder. Appellant proffered a jury instruction that stated, "if you find the defendant guilty of first[-]degree felony murder in the commission of an abduction, then you must find him not guilty of the offense of abduction." The court denied the instruction.

ANALYSIS

A. Social Media Accounts

Appellant contends that the court erred by admitting Commonwealth's Exhibits 17 and 18, subpoena returns for his Facebook and Instagram account. He argues that because the accounts were not registered in his name, the Commonwealth did not properly authenticate the exhibits.

"This Court reviews a [circuit] court's ruling admitting or excluding evidence for abuse of discretion." *Murray v. Commonwealth*, 71 Va. App. 449, 456 (2020) (alteration in original) (quoting *Payne v. Commonwealth*, 292 Va. 855, 866 (2016)).

Virginia Rule of Evidence 2:901 addresses authentication of evidence and states, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." The rule applies to social media. *See Atkins v. Commonwealth*, 68 Va. App. 1, 8 (2017) (stating that the standard for authentication "holds true universally and applies equally to statements made over the telephone, through text messages, by emails, or using social media such as Twitter").

Appellant does not contend that Exhibits 17 and 18 are anything other than what they appear on their face: records from a Facebook and Instagram account. Detective Hinson testified that he discovered information related to social media accounts possibly maintained by appellant, and

- 6 -

based on that information, he acquired a search warrant that yielded the information in Exhibits 17 and 18. Detective Hinson also testified that during appellant's interview, appellant identified multiple photos and posts from the two social media accounts and confirmed that the accounts belonged to him and that he was the person in the photos.

Appellant reiterated this information when he testified at trial. He confirmed that Exhibit 18, the Instagram account, was his account, and he identified pictures from both accounts and explained why he chose the username on one of the accounts.

"The measure of the burden of proof with respect to factual questions underlying the admissibility of evidence is proof by a preponderance of the evidence." *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001) (quoting *Witt v. Commonwealth*, 215 Va. 670, 674 (1975)). Here, the court determined that the Commonwealth proved, by a preponderance of the evidence, that the social media accounts were authenticated and admissible. We decline to hold that the court abused its discretion in reaching this conclusion**.**

## B. Assignment of Error 2 – Excited Utterance

Appellant argues that Ortega's comment, "Good," when she was told during an interview that the victim was dead and his grave had been located, was admissible. He contends that the statement falls under the excited utterance exception to the hearsay rule.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801. Hearsay is not admissible evidence. *See* Va. R. Evid. 2:802. However, there are exceptions to the hearsay rule. One exception is an excited utterance, defined as a "spontaneous or impulsive statement prompted by a startling event or condition and made by a declarant with firsthand knowledge at a time and under circumstances negating deliberation." Va. R. Evid. 2:803. There is no "fixed rule" to determine if a statement is admissible as an excited utterance. *Caison v. Commonwealth*, 52

- 7 -

Va. App. 423, 431 (2008). A trial court considers multiple circumstances "when determining whether the declarant's statement was prompted by a startling event, and not the product of premeditation, reflection or design." *Hicks v. Commonwealth*, 60 Va. App. 237, 246 (2012) (quoting *Perry v. Commonwealth*, 58 Va. App. 655, 669 (2011)). "The statement must be prompted by a startling event and be made at such time and under such circumstances as to preclude the presumption that it was made as the result of deliberation." *Goins v. Commonwealth*, 251 Va. 442, 460 (1996).

Appellant contends that Ortega's statement constituted an excited utterance, but the court disagreed because her statement did not "rise[] quite to the level of a spontaneous utterance." The statement was elicited in the context of an extensive interview which, according to her own testimony, took place weeks after Ortega witnessed the death of the victim, so information that he was dead was not a surprise to her. Unlike the statement in *Clark v. Commonwealth*, 235 Va. 287, 293 (1988), where the Supreme Court held that a statement made five to ten minutes after the declarant was shot was an excited utterance, Ortega's statement here was not an "instinctive reaction to a horrifying event." *Id.* Accordingly, we find that the court did not abuse its discretion in excluding the statement.

## C. Assignment of Error Three – Expert Testimony

Appellant argues that the court impermissibly allowed the Commonwealth to "elicit an opinion on an ultimate issue of a gang membership in MS-13." Appellant cites to the testimony of Detective Betts, who testified as an expert in gang activity and the MS-13 gang, and who stated that the evidence could indicate that appellant is a member of MS-13.

The Virginia Rules of Evidence forbid an expert witness from testifying about an ultimate issue of fact. *See* Va. R. Evid. 2:704(b). However, both in his brief and at oral argument, appellant conceded the issue of gang membership. In his brief, appellant states that he "[c]oncede[s] that

- 8 -

there was sufficient evidence for the jurors to find that [appellant] was a member of a criminal street gang, even without Detective Betts' opinion, since both Cesar Ochoa Carillo and Julieth Ford Ortega testified that the Defendant was MS-13." Therefore, even if the court erred by allowing the expert's testimony, any error was harmless, based on appellant's concession.

"The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). The best and narrowest grounds may include a finding that an error is harmless as a matter of law. *See* Code § 8.01-678; *see also Kirby v. Commonwealth*, 50 Va. App. 691, 699 (2007) (noting that the harmless error doctrine is a legislative mandate explicitly limiting the power of appellate courts). "A non-constitutional error is harmless when it 'plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Anderson v. Commonwealth*, 282 Va. 457, 466 (2011) (quoting *Rose v. Commonwealth*, 270 Va. 3, 11-12 (2005)). Here, the testimony elicited from other witnesses, along with appellant's concession on brief, establish that if the detective's testimony should have been excluded, any error that the court made in allowing it was harmless.

## D. Assignment of Error 4 – Jury Instruction

Appellant contends the court improperly denied the following instruction: "if you find the defendant guilty of first[-]degree felony murder in the commission of an abduction, then you must find him not guilty of the offense of abduction." Appellant argues that convicting him of first-degree felony murder and the underlying felony of abduction, as the jury did, violated the Double Jeopardy Clause of the Fifth Amendment.

Generally, we defer to the discretion of the court in determining whether to grant or deny a jury instruction. *See Nottingham v. Commonwealth*, 73 Va. App. 221, 228 (2021). "However, this

Court reviews *de novo* whether an instruction 'accurately states the relevant law.'" *Ducharme v. Commonwealth*, 70 Va. App. 668, 674 (2019) (quoting *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)).

The Fifth Amendment to the U.S. Constitution provides that no "person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. *See Coleman v. Commonwealth*, 261 Va. 196, 199-200 (2001) (stating that the Fifth Amendment "guarantees protection . . . against multiple punishments for the same offense"). Code § 18.2-32, defining first-degree murder, includes a killing that takes place "in the commission of, or attempt to commit . . . abduction." Code § 18.2-47 prohibits abduction. Appellant's contention that he could not be convicted of both first-degree felony murder and the underlying felony of abduction is incorrect.

This Court addressed the precise issue of double jeopardy in a felony murder context in *Spain v. Commonwealth*, 7 Va. App. 385 (1988). The defendant was convicted of both felony murder, in violation of Code § 18.2-32 and the underlying felonies of burglary and robbery. *Id.* at 389. In denying the defendant's request to reverse his conviction based on a double jeopardy violation, we determined that "the purpose of references to felonies in the murder statutes is gradation and not prohibition of punishment for the underlying felonies." *Id.* at 392. Therefore, multiple convictions in a single trial for murder committed during a felony and the underlying felony do not violate the constitutional protections against double jeopardy. *See id.*; *see also Stumpf v. Commonwealth*, 8 Va. App. 200, 207 (1989) (affirming denial of a double-jeopardy jury instruction for a defendant on trial for both first-degree murder and the underlying felony of robbery). Because appellant's proposed instruction was an incorrect statement of law, the court did not err in denying it.

E. Assignment of Error Five – Sufficiency of the Evidence

Appellant's final assignment of error challenges the sufficiency of the evidence to prove that he participated in the murder as a member of a criminal street gang. "When reviewing the sufficiency of the evidence, '[t]he judgment of the [factfinder] is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (first alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). Instead, we ask "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Pijor*, 294 Va. at 512). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

Code § 18.2-46.2 prohibits "willful participat[ion] in any predicate criminal act committed for the benefit of, at the direction of, or in association with any criminal street gang." Appellant argues that although the Commonwealth presented sufficient evidence to prove that he was a member of a gang, it did not prove that the victim's murder was gang-related.

"The offense of participating in a criminal street gang contains three elements that the Commonwealth must prove to sustain a conviction under the statute." *Hamilton v. Commonwealth*, 279 Va. 94, 108 (2010). "First, a person must actively participate in or be a member of a criminal street gang. Second, the person must knowingly and willfully participate in a predicate criminal act.

- 11 -

Third, the act must be committed for the benefit of, at the direction of, or in association with the gang." *Id.*

Only the third element is at issue here. The testimony established that appellant was a member of MS-13 and had a high enough rank to give orders. The other men involved in the killing, Estupianian and Diaz Martinez, were gang-affiliated, and Carillo was a lower-ranking gang member told to bury the body. Carillo testified that he acquiesced because appellant was a higher-ranking gang member and he was fearful that appellant could retaliate if Carillo did not comply. Ortega stated that when appellant and Estupianian beat the victim to death, they called him a "rival gang member" and discussed "revenge" for a prior stabbing of Diaz Martinez. Appellant also told Ortega she was "in the gang now" after they killed the victim. Detective Betts provided expert testimony that one goal of MS-13 is to commit violent acts to scare the community. Appellant himself admitted that the three men armed themselves and intended to beat the victim.

Viewing these facts in the light most favorable to the Commonwealth, a rational factfinder could conclude that appellant committed the underlying predicate criminal act of murder for the benefit of or in association with the MS-13 gang. *See Morris v. Commonwealth*, 58 Va. App. 744, 751-52 (2011) (affirming a conviction when a gang member participated in an attack in association with another gang after hearing gang leaders say that it would improve the member's status). For these reasons, we hold that the evidence was sufficient to sustain his conviction.

CONCLUSION

The court did not err in admitting the Commonwealth's social media evidence, denying hearsay testimony, and denying appellant's jury instruction. Any error in admitting the expert opinion about gang membership was harmless. Further, the evidence was sufficient to prove that appellant "participated in murder as a member of a criminal street gang." We therefore affirm

appellant's convictions for abduction, first-degree murder, concealing a dead body, and criminal street gang participation.

*Affirmed.*